186 N.J. Super. 465 (1982)
453 A.2d 218
ROSE LEE HUDGINS, ADMINISTRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF DONALD G. HUDGINS, DECEASED, AND ROSE LEE HUDGINS, INDIVIDUALLY, PLAINTIFF-RESPONDENT,
v.
FRANCISCO SERRANO, M.D., JOHN P. MULLEN, M.D., SURA POL ARKKRAPRIDI A/K/A SURA POL ARK, M.D., WARREN HOSPITAL, A CORPORATION TRANSACTING AND DOING BUSINESS IN NEW JERSEY, C.F. FRANTZ, R.N., B. PORTER, G.N., JANE DOE (FICTITIOUS NAME) AND MARY ROE (FICTITIOUS NAME), DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 5, 1982.
Decided July 19, 1982.
*468 Before Judges FRITZ, ARD and TRAUTWEIN.
Richard E. Brennan argued the cause for appellant Mullen (Shanley & Fisher, attorneys; Richard E. Brennan and Thomas J. Alworth, on the brief).
Leonard Rosenstein argued the cause for appellants Warren Hospital, Frantz and Porter (Feuerstein, Sachs & Maitlin, attorneys).
Jac B. Weiseman argued the cause for respondent (Blume & Weiseman, attorneys).
The opinion of the court was delivered by FRITZ, P.J.A.D.
In this action for conscious pain and suffering to plaintiff's decedent and for dependency damages in a wrongful death action, all predicated upon alleged medical malpractice, the jury returned a verdict in the amount of $7,500 in the survival action and in the amount of $1,150,000 in the death action. Following the denial of the motion of Dr. Mullen for a new trial on all issues, a remittitur or in the alternative a new trial as to damages only, and the denial of plaintiff's motion for additur, defendants Mullen, Porter, Frantz and Warren Hospital filed timely notices of appeal. Plaintiff cross-appealed from the *469 denial of her motion for additur. The latter appeal has been abandoned.[1]
Expressed in five points, defendants' complaints on this appeal distill into three areas: (1) the charge, (2) the qualification of Dr. Coombs and (3) the amount of the verdict. We consider those in that order.
The objections to the charge are subdivided into four areas. The first of these accuses the trial judge of having charged the jury in a manner which was "rambling, anecdotal and laced with prejudice against the defendant." The second and third criticize the charge with respect to the definition of proximate cause and burden of proof, respectively. Finally, a challenge is leveled at "error in instructing the jury with respect to pre-existing pain and suffering."[2] At the outset we observe that in connection with the charge in this case, the transcript of which totalled 113 pages, the only objection raised by defendants was that of counsel for Dr. Mullen who objected only to so much of the charge as "switched" the burden of proof of the allocation of damages for pain and suffering, following the determination of the existence of such actionable damages, to defendant. The other complaints respecting the charge were not raised below, a fact not reported to us in the table of contents of defendants' brief (R. 2:6-2(a)(1)) although said to be a "conceded fact" in the reply brief of defendants. Accordingly, we need consider those complaints only to the extent that they demonstrate plain error, i.e., error which is of such a nature as to have been clearly capable of producing an unjust result. R. 2:10-2. In this respect we note as well the wisdom of Judge Labrecque as it appears in Nesta v. Meyer, 100 N.J. Super. 434 (App.Div. 1968):

*470 Relief under the plain error rule is to be sparingly granted. Ford v. Reichert, 23 N.J. 429, 435 (1957). The purpose of the rule requiring objection to the charge is to alert the trial judge to the asserted error and thus afford him an opportunity of correcting it before the jury retires to deliberate. Gluckauf v. Pine Lake Beach Club, Inc., 78 N.J. Super. 8, 18 (App.Div. 1963). Frequently, for reasons of trial strategy or otherwise, experienced counsel elects to overlook an omission or inadvertence on the part of the trial judge. In such case an inference of passive indifference, if not acquiescence, may be drawn. Cf. Priest v. Poleshuck, 15 N.J. 557, 564 (1954); Valls v. Paramus Bathing Beach, Inc., 46 N.J. Super. 353, 357 (App.Div. 1957). But counsel may not be permitted to overlook alleged error in the charge as given to gamble on a favorable verdict and, upon the coming in of an adverse one, seek a "second bite of the apple" on the basis of plain error. Cf. Lippman v. Ostrum, supra, 22 N.J. [14] at p. 26. [100 N.J. Super. at 446]
It is difficult to reconcile the "passive indifference" demonstrated here by the absence of objection following this lengthy charge with the unrestrained assertions in the brief before us of such events as the trial judge's having "instantly prejudiced the defendants by his opening comments to the jury," and having engaged in a "needless whetting of the jury's appetite" and, by virtue of "comments [which] were totally gratuitous and the product of misguided zeal to render an esoteric subject intelligible to the average juror," having "sowed the seeds of a large pecuniary verdict against the defendant." Nor is an explanation for this inconsistency between the conduct of trial counsel and the concerns of counsel on the brief made more understandable by the fact that in at least two places in defendants' brief, misstatements (which are inadvertent, we are certain) appear. For instance, defendants claim apropos of the charge that the jury might find more than one defendant responsible, "[t]he Court neglected, however, to tell the jury that they might find none of the defendants responsible." This simply is not so. After announcing his intent to consider damages with the jury and before the damage charge was given, the judge stated, "This assumes that you find somebody who was negligent, it assumes that you find the negligence was a proximate cause of death and in the wrongful death claim or of unnecessary pain in the survival action." Later on, discussing the verdict sheets, he mentioned that which was "certainly a possibility that ... you *471 found that none of the defendants is liable." Beyond this, counsel complains of the judge's "directing the jury to be Monday morning quarterbacks with respect to the cause of death [and having] impermissibly allowed the jury to judge the defendants' conduct by hindsight." The fact of the matter is that after the judge pointed out the benefits available to the jury by a backward look, he concluded with the instruction that when the jury was
... evaluating their [defendants] conduct at the time they, of course, didn't have the benefit of such things as tissue slides and the like. You have to judge them in terms of what they knew and what they observed at the time.

And, the claim against Dr. Mullen is that as an orthopedist and from what he observed, from what he knew of Mr. Hudgins' condition, he should have done, should have done more. [Emphasis supplied]
Be all that as it may, in the interest of justice and without regard for this "passive indifference" of trial counsel or the zeal of the brief writer reflected in the misstatements, we have been assiduous in our review of the charge. With respect to defendants' first three subdivisions of this issue, we find that the charge read as a whole, as it must be, State v. Wilbely, 63 N.J. 420 (1973); State v. Council, 49 N.J. 341 (1967), in its over-all effect fairly apprised the jury of its obligations in this trial and certainly was not clearly capable of producing an unjust result. We cannot disagree with the contention of defendants that the charge was rambling and anecdotal. To this we would add that it was verbose. We believe, as did the court in State v. Council, supra, that the charge was not as clear or as comprehensive as it might have been, but as was the case in Council, we are unable to say that our careful review of it revealed prejudicial error in all this. We find no prejudice to defendants, either intentional or unintentional, emanating from the charge. As a matter of fact, a careful reading reveals a fairly even spreading of examples and comments pointing toward an unhappy result for plaintiff and defendants. As suggested above, "The failure to object points up the fact that experienced counsel did not consider that the use of the words detracted from the clear meaning which the charge as a whole *472 conveyed." State v. Wilbely, supra, 63 N.J. at 422. We are satisfied that both with respect to proximate cause and the burden of proof, the jury went into the jury room having been adequately advised as to their duty.
We have separated the fourth subsection of the complaint on the charge from the others because an objection in this respect was forwarded. With consideration for the fact that a number of defendants had participated in the medical care offered decedent between the time of his admission to the hospital and his death some seven hours later, and with proper regard for Fosgate v. Corona, 66 N.J. 268 (1974), the trial judge instructed the jury that if it found the "unnecessary" pain and suffering endured by decedent was the fault of one or more of the defendants, it would be necessary for the jury to make an evaluation and in this respect the burden was upon defendants to convince the jury of the probabilities respecting apportionment. We have no doubt of the propriety of this charge as a statement of the principle of Fosgate v. Corona. There it is said respecting malpractice involving the treatment of a pre-existing disease that
.... Where the malpractice involves treatment of a preexisting disease, the assessment of damages poses a problem because of the practical difficulty in separating that part of the harm caused by the malpractice from the preexisting disease and its normal consequences. Because of this, courts are now taking the view that in a situation where the malpractice or other tortious act aggravates a preexisting disease or condition, the innocent plaintiff should not be required to establish what expenses, pain, suffering, disability or impairment are attributable solely to the malpractice or tortious act, but that the burden of proof should be shifted to the culpable defendant who should be held responsible for all damages unless he can demonstrate that the damages for which he is responsible are capable of some reasonable apportionment and what those damages are. As stated in Prosser, Law of Torts, (4 ed. 1971), § 52 at 319,
The justification for this rests upon the fact that a choice must be made, as to where the loss due to failure of proof shall fall, between an entirely innocent plaintiff and defendants who are clearly proven to have been at fault and to have done him harm. [at 272-273]
Defendants endeavor to distinguish Fosgate on the basis that "there was no pre-existing disease or condition as these terms were used in Fosgate." This does not distinguish the principle *473 of Fosgate that where pain and suffering result from a cause not the responsibility of defendants but is aggravated by the tortious act of defendants, the entirely innocent plaintiff shall not be responsible for a failure of proof respecting apportionment between these causes. It is significant that the trial judge isolated the damages attributable to defendants, and thus the subject of apportionment proof, by his repeated reference to them as "unnecessary" pain and suffering, that is unnecessary because that pain and suffering would not have occurred except for the tortious conduct of one or more of defendants. While this may constitute somewhat of an extension of Fosgate, it is in our opinion a most rational and proper extension.
In sum, we find no prejudicial or reversible error in the charge, much less plain error respecting the several points to which no objection was made.
Three of defendants' five points are directed toward qualification of Dr. John W. Coombs. The first of these insists that since Dr. Coombs is not licensed to practice medicine in New Jersey or elsewhere, he could not under any circumstances qualify to testify as an expert in this case. The second point is directed to the harmfulness of Dr. Coombs' testimony and really constitutes a backfire built to forfend against any assertion of harmless error. The third point is really an extension of the second point, insisting that other medical testimony on behalf of plaintiff was incompetent whereby Dr. Coombs' testimony was not only not merely cumulative but the lack of qualification led to an unjust result as well. It is to be seen that all three of these issues turn on the question of whether acceptance by the trial judge of Dr. Coombs' qualifications to testify was proper. We believe it was and find these issues without merit.
Defendants rest their case in this respect in essence upon their insistence that a license to practice is a sine qua non for qualification. Their position depends for support almost solely on Sanzari v. Rosenfeld, 34 N.J. 128 (1961). There, they point out, the court held:

*474 The test of whether a particular witness is competent to testify as an expert in a malpractice action is whether he has sufficient knowledge of professional standards applicable to the situation under investigation to justify his expression of an opinion relative thereto. Carbone v. Warburton, supra, 11 N.J., [418] at p. 425. It is generally held that the witness must be a licensed member of the profession whose standards he professes to know. See, e.g., Hull v. Plume, supra, 131 N.J.L., [511] at p. 515; Rawleigh v. Donoho, 238 Ky. 480, 38 S.W.2d 227 (Ct.App. 1931). The reason for this requirement is that when the subject matter testified to falls distinctly within the province of a particular profession, the license to practice imports the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion. [34 N.J. at 136]
We think the argument is an overload on Sanzari. In the first place, the quotation from the case which appears in defendants' brief omits the first sentence of the paragraph quoted above, and commences with the second sentence. Expressly incorporated in that first sentence is the test as to competency to testify as an expert, and that is defined in terms of "whether he has sufficient knowledge of professional standards applicable to the situation under investigation to justify his expression of an opinion relative thereto." In the second place, it is to be seen that Hull v. Plume, 131 N.J.L. 511 (E. & A. 1944), does not hold that a witness must be a licensed member of the profession whose standards he professes to know. Rather, it speaks of qualifications in terms of "knowledge and experience in the same profession to know and state whether in the given circumstances of a particular case the physician or surgeon had failed to exercise that degree of knowledge and skill which usually pertains to other members of his profession." 131 N.J.L. at 515. Finally, it is to be seen that in Sanzari the witness found to be qualified to testify as an expert in a dental malpractice action was not in fact licensed as a dentist. To claim that Sanzari holds that licensure in the profession is an absolute prerequisite to qualification to testify as an expert in the profession while at the same time holding qualified one not so licensed is to attribute to the Supreme Court a dexterity with which we are certain even their severest critics would not credit them.
We believe that the word "generally" in the quotation from Sanzari clearly qualifies any purported rigidity of the rule. We *475 believe, as did the trial judge below, that while a license does indeed import the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion, that the prerequisite minimal technical training  and perhaps more  may also be gained otherwise and demonstrated as here.
It is clear from the statements of the trial judge at the time Dr. Coombs was offered for qualification, including comments to the jury regarding the process, and in his comments at the motion for a new trial, that the trial judge understood the basis for expert qualification as outlined in "the test" explicated in Sanzari. These included particular knowledge of the standard of care required in circumstances presented in the case at bar, a qualification particularly under attack here. We will not lightly disturb this discretionary ruling. Rose v. Port of New York Auth., 61 N.J. 129, 139 (1972); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 411 (1960).
The record suggests to us not only the absence of a "clear abuse of discretion," but indeed, sufficient qualification on the part of Dr. Coombs fully to justify the determination of the trial judge tested against the Sanzari standard. In addition to his degree as a doctor of medicine (M.D.), which, according to the testimony of another doctor in this case, would qualify him to practice medicine without a state license in hospitals administered by the Federal Government, such as veterans administration hospitals and military hospitals, Dr. Coombs possessed the degree of doctor of philosophy (Ph.D.) in experimental pathology. His four years in medical school culminated in a graduation which reflected his having prepared a nonrequired "honors dissertation," as well as having received two awards for outstanding student research. He was on the faculty of the Pennsylvania State University Medical College and later became an associate professor of pathology at the University of Maryland Medical School. In this latter position he is to undertake the supervision for the surgical-pathology laboratories at the school as well as the position of director of the second-year medical curriculum in pathology. While at the Pennsylvania State University *476 Medical School he taught medical students, interns and residents. As a pathologist he has performed autopsies and conferred with medical staff with respect to his analysis of the results of medical, surgical and emergency treatment, including the expression of his opinion on "its appropriateness." He has published papers in medical journals. Among other subjects he has taught are those of cardiovascular and respiratory pathology as well as courses dealing with traumatic injury. As was the trial judge, we are satisfied that Dr. Coombs was qualified by training and experience, and the absence of a license from the walls of his office does not diminish those qualifications.
Finally, we undertake the question of damages. At the outset we report that we have no trouble at all for any reason with respect to the $7,500 allowed for conscious pain and suffering. Its reasonableness is conceded by defendants.
We turn to damages in the wrongful death action. We are well aware that an award in such an action  a statutory entitlement  is not a matter of punishment for an errant defendant or of providing for decedent's next of kin to a greater extent than decedent himself would have been able, but is rather a replacement for that which decedent would likely have provided and no more.[3] We know here as well that decedent never earned more annually than the roughly $21,000 projected from eight-month earnings for the year of his death. As a result we are inclined at first blush to raise an eyebrow at a verdict exceeding well over a million dollars. After all, $1,150,000 represents the gross return on almost 55 years of labor at $21,000 a year, undiscounted for present value.[4] We immediately recall, however, the consistent, recurring and forceful admonitions *477 of our court of last resort respecting the sanctity of jury verdicts on factual issues, coupled with the admonition that we not become one additional and deciding juror, and that a judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate in the circumstances of the case as to shock his conscience and to convince him that to sustain the award would be manifestly unjust. Examples of the sources of our instruction in these regards may be found respectively in Baxter v. Fairmont Food Co., 74 N.J. 588, 597-599 (1977); Dolson v. Anastasia, 55 N.J. 2, 6 (1969); Sweeney v. Pruyne, 67 N.J. 314, 315 (1975). That these instructions apply to review in the Appellate Division as well as in the trial court, and to factual determinations made by a judge sitting without a jury as well as to the overview of jury responses is to be seen from Leimgruber v. Claridge Associates, Ltd., 73 N.J. 450 (1977). It was with this candidly reported preconditioning that we undertook our careful review of the record. Having done this we note that, for reasons which will appear, despite our concurrence with the jury's verdict reflecting manifest negligence in this case and despite our instinctive reaction favoring this widow who was left with three children to whom a fourth was added by the birth of a daughter 17 days after decedent's death, the verdict viewed in light of the record does indeed shock our conscience and convinces us that to sustain this award would be manifestly unjust.
We pause at the outset to point out an established and confining legal principle disregarded, at least to a certain extent, in the understandably zealous defense of the verdict by counsel for plaintiff: pecuniary loss is the test. Jurman v. Samuel Braen, Inc., 47 N.J. 586, 599 (1966). As there noted, it is the sole measure. We cannot ignore the significance in that formula of the word "loss." While some states have relaxed the strict pecuniary approach, we have not. In this regard, our Supreme Court has been obviously motivated by a proper respect for the doctrine of separation of powers. As is the case with other states which, "feeling trapped by the strict pecuniary *478 loss limitation set forth in their Wrongful Death Act," have been openly critical of their legislatures, New Jersey has nevertheless reaffirmed that "`pecuniary injuries' suffered by the surviving next of kin is the standard for all wrongful death cases." Green v. Bittner, 85 N.J. 1, 10-11 (1980). The intent of the statute is to provide those entitled with that which they could have reasonably expected had decedent survived. Where those expectations anticipated something to be provided by the person of decedent other than that which could be furnished with coin of the realm, such as loving care and consortium, the entitlement is to money sufficient to provide a substitute to the extent it can be provided. Its value must be confined to what the market place would pay a stranger with qualifications as similar to those of decedent as possible under the circumstances for performing such services. Significantly, no pecuniary value may be attributed to emotional pleasures or satisfaction now lost. Green v. Bittner, supra at 12-13. Our Supreme Court poignantly notes, "That prohibition is not a matter of our choice, rather it is fundamental to the legislation." Id. at 13; footnote omitted.
Goods and services beyond the capabilities of decedent, but which he might have been expected to provide, such as special education for one child here, stand in a somewhat different position. The allocation of the verdict in this respect must fit within that allotted for other necessities which decedent presumably would have furnished, such as food, shelter and clothing. In such case, where the needs in this admittedly conjectural area exceed the means, the verdict must be limited to the means. Somewhat tritely, we confess, we observe that one cannot lose that which money can buy if, in any event, there would have been insufficient money to buy it. To adopt any other position diminishes the sense of the word "loss" in the statute and the cases. As unfeeling as it might appear, the fact remains that under our law, if a worthless derelict unlikely to be rehabilitated dies from defendant's tort leaving a young wife and ten children, several of whom need special education, the *479 verdict, if any, cannot legally be very significant, at least in this regard. Given the same circumstances respecting the number and nature of surviving dependents of a millionaire of the same age as the derelict but who earned a substantial living and was generous with his family, those who needed it less than did the survivors of the derelict would be entitled to much more. If this represents an inequity, the solution must be provided by the Legislature.
The situation of the next of kin is obviously important. But its importance and the "need" created by it cannot make way for a verdict in excess of that which reasonably would have been and could have been provided by decedent, either by his personal attention and services or his reasonably projected financial abilities. We will not substitute "need" for "loss" as the latter word is used in Jurman, or "injuries" as it appears in the statute. We think the Legislature did not intend that a defendant should subsidize the next of kin to an extent they could not have realized had decedent lived, simply because of defendant's tortious conduct.
Having determined that the verdict in the wrongful death action must be set aside, we turn to that which we intend as "a carefully reasoned and factually supported (and articulated) determination" supported by our careful review of the record. Baxter v. Fairmont Food Co., supra, 74 N.J. at 597. The required weighing of the evidence, also directed by Baxter, presents no real problem because as to the operative facts there seems to be very little dispute. In order that there be no question, we will, in any event, accord to plaintiff the benefit of all the factual testimony. This not only includes such background as the fact that decedent was undoubtedly a hard worker and a good provider for his wife and three children (at the time of his death; as noted above, a fourth was born shortly thereafter), but also enjoyed a substantial increase in wages, approximating a gross annual increase of about 27% from 1973 when he left employment by the Bell Laboratories Division of *480 American Telephone and Telegraph to become an executive chauffeur for a different division of the parent company. We know as well that in the year in which he died his earnings to August 29 were $13,887, extrapolating to an annual salary of $20,831. There is no evidence in the record that he ever made more than that in the course of a year, and it appears that until his movement from Bell Laboratories to the chauffeur position his annual gross wage had been only half that. We accept the fact that at the time of his death he had a life expectancy of 34 years and a work expectancy period of 30 years. While we are adjured by counsel for plaintiff to assume a growth factor in income during the balance of the work expectancy, we will not make this assumption for the simple reason that plaintiff's actuary, self-described as an "economic consultant," consistently and repeatedly opined that current salary times the number of expected years reasonably compensated for growth and gave "a reasonable value as to the future loss." However, we believe that counsel for plaintiff is not unreasonable in pointing out the necessity to consider fringe benefits, including a contributory retirement plan. In this respect, we accept the projection forwarded in plaintiff's brief and attribute to these fringe benefits an undiscounted $55,000.
In order that we may test our shock point to the limit, we attribute to decedent an intention to work all his life rather than to retire short of his life expectancy. Extrapolating, in the manner suggested by plaintiff's expert, this 34 years of life expectancy at $20,831, we gain a gross income of $708,254. From that we deduct, as suggested by plaintiff's expert, so much of the gross income as is probably attributable to "personal consumption" and tax liability, a figure thought to be 30% or $212,476. We are left with $495,778, to which we add $62,333 for fringe benefits (i.e., the figure from plaintiff's brief extrapolated to account for the difference between the 30 years there used and the 34 years we are assuming). This formula, derived principally from the testimony of plaintiff's expert, produces a total of $558,111.
*481 To this we add a value for the lost nurture, guidance and training of the children, adapted loosely but generously, i.e., without any discount, from the source urged by plaintiff, Meehan v. Central R. Co. of N.J., 181 F. Supp. 594 (S.D.N.Y. 1960).[5] The four children respectively have about 7, 8, 9 and 18 years of anticipated life from the date of their father's death to their eighteenth birthday. The aggregate of 42 years times 10% of the projected annual income of decedent at the time of his death, i.e., $2,083, equals $87,486.[6]
The aggregate of all these demonstrates reasonableness in a figure of $645,597. The jury verdict approached twice that. Even allowing for the speculation and conjecture which is necessary in this type thing, this is simply too much. A deviation of as much as 20% might easily be understood and justified. A figure which approaches 200% is, in our judgment, a disproportion so gross as to constitute a manifest injustice.
We have not overlooked an exhibit appearing in plaintiff's appendix, said to be "evidence, which is in the record, and which the jury could have used in arriving at its award," which projects for decedent an annual income in the year 2001 of *482 $1,655,998.30 and an aggregate income between 1976 and the year 2001 totalling $8,273,321.90. The immediately obvious and apparent flaw in these calculations is that they assume the lack of an economic ceiling of any kind on increments based upon and standardized from a three-year period at the outset when a radical job change doubled the annual income in that three years. We are reminded of the frivolity describing the man who agreed to work a month starting at a penny a day if his employer would double his salary each day. For the tenth day he earned only $5.12. By the 20th day he earned for that day alone $5,242.88. The 30th day alone yielded him $5,368,708. We doubt the reality of the chart supplied by plaintiff.
With all the foregoing considerations in mind, we conclude that the judgment in the wrongful death action should not exceed $750,000.
Our confidence in the justice to plaintiff at this figure is bolstered by the observation that even if trial and appeal expenses diminish it by a third, the balance invested at a modest 10% will yield annually $50,000, 2 1/2 times the last annual wage of decedent, at the same time leaving the principal intact.
Remittitur is a practice which should be encouraged at both trial and appellate levels. Baxter v. Fairmont Food Co., supra, 74 N.J. at 595. We believe it an appropriate procedure here. Accordingly, we offer plaintiff a remittitur of all damages in the wrongful death action in excess of $750,000, exclusive of interest, which shall be accepted or rejected by her within 30 days by a writing filed with the Clerk of the Superior Court, a copy of which shall be sent to all adverse parties and to the clerk of this court. In the event the remittitur is accepted, a judgment consistent with the foregoing shall become final in this court, and the matter will be remanded for the sole purpose of a recalculation of interest. In this respect there is presently pending an open motion in this court wherein plaintiff seeks to modify the calculation of prejudgment and postjudgment interest. That motion is denied without prejudice to its being made *483 to the trial court at the time of the recalculation of interest. In the event the remittitur is rejected, the clerk of this court will enter an order vacating the verdict in the wrongful death action and remanding the matter for a new trial as to wrongful death damages alone. In such event, the pending motion is denied without prejudice to its renewal in the trial court at the conclusion of that trial.
So ordered.
NOTES
[1] Plaintiff also appealed from the verdict of the jury exonerating defendant Dr. Sura Pol Arkkrapridi. This appeal has also been abandoned.
[2] The shorthand reporter who certified the transcript of the charge acknowledged numerous errors in the transcript. These have been corrected. Unfortunately, this acknowledgment postdated the filing of appellants' brief. We have taken this into consideration in our review of the charge.
[3] The "pecuniary injuries" suffered by the next of kin, i.e., "the persons entitled to any intestate personal property of the decedent." N.J.S.A. 2A:31-5.
[4] But also, we acknowledge at the outset, without regard for (a) increments, (b) inflation or (c) fringe benefits.
[5] For the lack of a better standard and in order to assure justice, for these purposes we adopt plaintiff's reference but not her calculation. Compare the calculations appearing at 181 F. Supp. 620 used as a formula by plaintiff in her brief with those at 621-622 which we have here utilized. The latter is obviously more appropriate. It is also to be remembered that we use this modified calculation, from one espoused in principle as "[a] possible calculation the jury could have made," in the process of testing that which we have called our shock point. This is not to be deemed a determination that this formula from a case suggested by plaintiff should become a model for the calculation of nurtural damages.
[6] We have intentionally omitted a projection for loss of household services. We are satisfied that with the generous (aggregate of 40% of annual salary) allowance for nurtural loss, it would be unjustifiably extravagant to augment that figure with damages for these services which, it is argued in plaintiff's brief, included teaching the children and baby sitting three days a week. Put otherwise, compensating for household services would require a modification of the proportion allotted for child nurture.