518 So.2d 609 (1987)
Lynette Inez THOMPSON
v.
Dr. Robert CARTER.
No. 56874.
Supreme Court of Mississippi.
October 7, 1987.
Dissenting Opinion October 10, 1987.
Rehearing Denied January 13, 1988.
*610 Crymes G. Pittman, Robert G. Germany, Cothren & Pittman, Jackson, for appellant.
Paul J. Delcambre, Jr., Page, Mannino & Peresich, Biloxi, for appellee.
En Banc:
PRATHER, Justice, for the Court:
At issue in this appeal are two evidence questions addressing the conditions under which (1) a "package insert" accompanying a pharmaceutical product may be introduced into evidence, and (2) the admissibility of a non-physician's expert testimony on the issue of a physician's standard of care with respect to the use and administration of pharmaceutical drugs.
In this medical malpractice action, Lynette Inez Thompson contended she developed Stevens Johnson Syndrome as a result of Dr. Robert Carter's negligent prescribing of the drug Bactrim. From a directed verdict in the Circuit Court of Harrison County, Thompson appeals, assigning as error:
(1) The court erred in refusing to admit into evidence the package insert relative to the drug Bactrim.
(2) The court erred in refusing to admit the testimony of Michael P. Hughes, a pharmacologist and toxicologist, on the issues of liability and causation.
(3) The court erred in sustaining appellee's motion for a directed verdict.
This Court reverses.

I.
At 8:15 p.m. on February 7, 1976, Lynette Thompson (appellant) was taken to the emergency room of Howard Memorial Hospital in Biloxi, Mississippi. Ms. Thompson suffered pain in her right side that had persisted for two days, and she had experienced a recent episode of vomiting. After an initial examination by the emergency room physician revealed blood and pus in Thompson's urine, Ms. Thompson was admitted into the hospital. In the history given at the time of admission, Ms. Thompson indicated she had no known allergy to drugs.
Ms. Thompson was later seen by Dr. Robert Schmidt who sought consultation with Dr. Robert Carter, a urologist. Dr. Carter diagnosed Thompson's ailment as pyelonephritis secondary to pyelitis cystica, a form of kidney infection. According to Dr. Carter, Thompson's kidney infection exhibited characteristics of being both acute and chronic.
To treat Thompson's kidney infection, Dr. Carter prescribed Bactrim, a sulfonamide antibiotic, beginning February 10, 1976. Ms. Thompson was discharged from the hospital February 11, 1976, with instructions to continue taking two Bactrim tablets per day and to visit Dr. Carter's office February 17, 1976.
At Thompson's February 17, 1976 visit to Dr. Carter's office, a urinalysis revealed a continued presence of pus and blood in her urine but in lesser amounts. Dr. Carter advised Ms. Thompson to continue taking Bactrim and to return to his office early in March.
Around February 22, 1976, Ms. Thompson began experiencing a sore throat, accompanied by coughing, spitting, and mouth sores. For her flu-like symptoms, Ms. Thompson refilled a penicillin prescription she had received in September, 1975 from another doctor and had taken without incident. She took the penicillin from February 25th until February 28th.
Ms. Thompson returned to Dr. Carter's office early in March.[1] Ms. Thompson contends she was still experiencing a nagging cough and a mild sore throat, but no complaints were made to Dr. Carter who determined Ms. Thompson was well from her kidney infection. Additional Bactrim was not prescribed to Ms. Thompson.
During the evening of Friday, March 5, 1976, Ms. Thompson began to notice red marks across her back and a swelling sensation over her entire body. By the following Monday, Ms. Thompson's arms, feet, *611 and face were swollen, her eyes were blurry, red bumps had arisen over her body, and blisters had formed in her mouth and genitals.
Ms. Thompson was hospitalized March 8, 1976 and was diagnosed as having Stevens Johnson Syndrome, a severe allergic response which causes the formation of blisters in the mouth, nose, and genitals. According to Dr. Carter's trial testimony, Stevens Johnson Syndrome is a recognized danger associated with Bactrim. Thompson remained hospitalized some twenty days and allegedly suffered severe and permanent scars.
In June of 1979, Thompson filed suit against Roche Laboratories, producer of Bactrim, and Dr. Robert Carter, appellee. Praying for $500,000 damages, Thompson employed breach of warranty, negligence and strict liability theories against Roche Laboratories, and a negligence theory of recovery against Carter. Thompson elected a voluntary nonsuit against Roche Laboratories, but the case against Dr. Carter was tried January 14 and 15, 1985. Because Thompson was unable to provide expert medical testimony, the trial ended with a directed verdict in favor of Dr. Carter.

II.

Initial Considerations
"The law has never held a physician or surgeon liable for every untoward result which may occur in medical practice, and a physician is not a warrantor against bad results." Dazet v. Bass, 254 So.2d 183, 187 (Miss. 1971). "[A] physician may incur civil liability only when the quality of care he renders (including his judgment calls) falls below minimally acceptable levels." Hall v. Hilbun, 466 So.2d 856, 871 (Miss. 1985).
To present a prima facie case of medical malpractice, a plaintiff, (1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identifying and articulating the requisite standard of care and (3) establishing that the defendant physician failed to conform to the standard of care. Boyd v. Lynch, 493 So.2d 1315, 1318 (Miss. 1986); Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss. 1985). In addition, (4) the plaintiff must prove the physician's non-compliance with the standard of care caused the plaintiff's injury, as well as proving (5) the extent of the plaintiff's damages. Boyd v. Lynch, 493 So.2d at 1318.

III.

Did the court err in refusing to admit into evidence the package insert relative to the drug Bactrim?
The issues under this assignment of error may be divided into two parts: (1) Was the package insert inadmissible hearsay? and (2) If admissible, for what purposes may the package insert be used.

A.

Was the package insert inadmissible hearsay?
Pursuant to congressional directives, the Food and Drug Administration (FDA) has developed a regulatory procedure to inform the medical profession about prescription drugs. 21 C.F.R. § 1, 201; 50 Fed.Reg. 51108 (1985) The "package insert" distributed with the drug by the pharmaceutical manufacturer is the basis of this system of notification concerning composition, dosage, indications, contraindications, potential side effects, and adverse reactions of drugs. The package insert information is based upon data the manufacturer has submitted to the FDA as proof that the drug is safe and effective for the uses the manufacturer wishes to market the drug. Jennings, The RX Label Basis for all Prescribing Information, FDA Papers (Nov. 1967) 14-15. The insert advises the physician, based upon the manufacturer's testing results, of (1) the conditions under which the drug should be prescribed, (2) the disorders it is recommended to relieve, (3) the precautionary measures which should be observed, and (4) warning of adverse effects that may result. A compilation of these package inserts on drugs, referred to as the Physicians' Desk Reference, *612 is annually distributed to the medical profession.
Under the common law scheme of hearsay exceptions, market quotations, tabulations, lists, directories and other published compilations generally used and relied upon by the public or by persons in particular occupations were excepted from the rule against hearsay. See e.g. Tucker v. Donald, 60 Miss. 460, 470 (1882); Yazoo & M.V.R. Co. v. M. Levy & Sons, 141 Miss. 199, 210, 106 So. 525, 527 (1925).
Since January 1, 1986, those hearsay exceptions have been compiled in Rule 803(17) of the Mississippi Rules of Evidence, which do not significantly alter the common law scheme.
Applying this rule of evidence to the instant case, the Court notes the testimony of Dr. Robert Carter, the defendant, identifying the package insert accompanying a pharmaceutical drug as "one source of reference" and "one source of information." He relied upon this package insert for information of adverse affects, or contraindications, of the drug Bactrim.
Further, Dr. Carter identified the Physicians' Desk Reference as "a good reference with some authority" and that it represented the standard of care "in the local area" of Biloxi with respect to the administration of the drug Bactrim at the time Lynette Thompson was treated by him. Carter used and relied upon the information contained in the Bactrim package insert in his practice and particularly for the treatment of Lynette Thompson. Although Dr. Carter testified that other medical publications and information were used and relied upon by him in his practice, that testimony does not diminish the admissibility of the package insert after identification by Dr. Carter of its acceptance by him as one source of information and by the medical profession in the Biloxi area as a standard of care in the administration of drugs.
The package insert is a compilation of information concerning pharmaceutical drugs and is generally relied upon by the public as well as physicians prescribing the drug. Therefore, we hold that the package insert, properly identified, was admissible by virtue of the above described exception to the hearsay rule.

B.

For what purposes may the package insert be admitted into 
evidence?
Other jurisdictions have allowed package inserts into evidence to serve a variety of purposes. See, Dixon, Drug Product Liability, § 7.02 (1986). One of the strongest cases to date in favor of allowing package inserts into evidence was Ohligschlager v. Proctor Community Hospital, 55 Ill.2d 411, 303 N.E.2d 392 (1973) in which the court allowed the manufacturer's instructions regarding the use of a drug to establish the professional standards ordinarily established by expert testimony.
It is suggested by some writers in this field of pharmaceutical drugs[2] that caution should be exercised by courts in accepting the manufacturer's test results as conclusive. Notwithstanding the government regulations in this field, the package insert is a marketing or merchandising procedure to promote sales. Drug manufacturers have had to answer for alleged dilution of warnings by over-promotion in sales programs. Magee v. Wyeth Laboratories, Inc., 214 Cal. App.2d 340, 29 Cal. Rptr. 322 (1963); Love v. Wolf, 226 Cal. App.2d 378, 38 Cal. Rptr. 183 (1964); Sanzari v. Rosenfeld, 34 N.J. 128, 167 A.2d 625 (1961).
Likewise, independent researchers have reached contradictory results to drug manufacturers and have recommended different dosages. Updated information gained from a broader base usage of a drug is not always reflected in the original insert until a new distribution of the drug or new publication of the Physicians' Desk Reference. Text writers suggest that antibiotic drugs[3] represent an exception to set dosages. *613 This rationale is explained by the assertion that as bacteria become more resistant to drugs, the dosage may be increased. A doctor's experiences offers a basis for varying dosages.
With these considerations in view, this Court is persuaded by the reasoning of the Idaho Supreme Court in Julien v. Barker, 75 Idaho 413, 272 P.2d 718 (1954). In Julien v. Barker the Court held:
[The package insert] is not conclusive evidence of standard or accepted practice in the use of the drug by physicians and surgeons, nor that a departure from such directions is negligent. But it is prima facie proof of a proper method of use, given by the maker, which must be presumed qualified to give directions for its use and warnings of any danger inherent therein.
Id. 272 P.2d at 724.
This Court agrees that the package insert in the instant case should not be taken as conclusive evidence of the physician's standard of care, nor should a departure from the directions contained in the package insert be considered to establish a prima facie case of negligence. However, this Court holds the package insert contains prima facie proof of the proper method of use of Bactrim and, for those purposes, was admissible at trial. See, Nolan v. Dillon, 261 Md. 516, 276 A.2d 36, 49 (1971); Salgo v. Leland Stanford Jr. University Board of Trustees, 154 Cal. App.2d 560, 317 P.2d 170, 180 (1957). The package insert can be given weight as authoritative published compilation by a pharmaceutical manufacturer. It is some evidence of the standard of care, but it is not conclusive evidence. The prescribing physician can be permitted to rebut this implication and explain its deviation from the manufacturer's recommended use on dosage. The holding will shift the burden of persuasion to the physician to provide a sound reason for his deviating from the directions for its use, and will require corroborative evidence to determine whether the physician met or violated the appropriate standard.

IV.

Did the court err by excluding the testimony of Michael P. 
Hughes?
At trial, appellant offered Michael P. Hughes as an expert witness in the fields of Pharmacology and Toxicology. Mr. Hughes testified that he had received a bachelor's degree from Millsaps College with major in chemistry and minor in biology and a master's degree in both Pharmacology and Toxicology. In the process of obtaining his degrees, he had taken five or six courses in Pharmacology and between eight and ten courses in Toxicology. After completing his graduate degree programs, Mr. Hughes became coordinator of the Regional Poison Control Center for the entire State of Mississippi. As coordinator for the Poison Control Center, which is located at the University of Mississippi Medical Center, Mr. Hughes was often consulted by physicians for suggested treatment of poisoning victims and other types of adverse reactions to various compounds or drugs. Mr. Hughes further testified he was on the teaching staff at the University of Mississippi Medical School and taught Pharmacology and Toxicology to both dental and medical students. Additionally Hughes had taken training to render emergency medical care as an "emergency medical technician."
Mr. Hughes testified that by virtue of his education and work experience, he was familiar with the drug Bactrim and its indications as well as its contra-indications. Likewise, he was familiar with Stevens Johnson Syndrome and its causes.
The trial court found that Hughes was qualified to testify as an expert witness as to causation in the field of Pharmacology and Toxicology, but was not qualified to testify concerning the standard of care to which physicians are required to conform with respect to the use and administration of drugs.
Pharmacology is defined as "The science that deals with drugs, their sources, appearance, chemistry, actions, and uses." Steadman's Medical Dictionary, p. 952 (3rd ed. 1972). Toxicology is "a science that deals with poisons and their effect on *614 living organisms, with substances otherwise harmless that prove toxic under particular conditions, and with the clinical, industrial, legal or other problems involved." Webster's Third New International Dictionary, p. 2419 (1961).
Appellant had no other expert witness to testify concerning causation or standard of care with respect to use and administration of drugs. A proffer of Mr. Hughes' testimony was offered which, if admitted, would have made a prima facie case. After the proffer, the trial court granted Carter's motion for directed verdict on the grounds that Thompson failed to establish the standard of care by an expert possessing a medical degree.

A.

Was Hughes qualified to testify concerning causation?
In Sonford Products Corp. v. Freels, 495 So.2d 468 (Miss. 1986), this Court reversed a circuit judge's order which disallowed a toxicologist from testifying as an expert witness in a workmen's compensation proceeding. Because he was not a medical doctor or a licensed physician, the toxicologist was not allowed to testify concerning the "medical causation" between the decedent's employment and his fatal condition.
The key to the Sonford decision was the Court's recognition that "`medical causation' is no more than causation in fact." Id. at 472. The Court held further:
It is this Court's opinion that Dr. Verlangieri is qualified to give an opinion regarding such "cause in fact" and should not be disqualified from testifying because his degree is a Ph.D. instead of an M.D. The Commission's inquiry should be whether the witness is in fact qualified  by knowledge, skill, experience, training or education  not by what degree he holds. It is certain and probable that Ph.D. biochemists and toxicologists are at least equally competent to testify as to the cause and effect of chemicals in our environment as medical doctors.
495 So.2d at 473, see also, Mississippi Farm Bureau Mutual Ins. Co. v. Garrett, 487 So.2d 1320, 1325-27 (Miss. 1986).
The Sanford rationale concerning causation would apply equally to the present case. A pharmacologist/toxicologist would be at least equally competent to testify concerning what effect a certain drug would have on the human body.

B.

Was Hughes qualified to testify concerning medical standard of 
care?
The issue under this question is whether an expert witness, called to establish the standard of care in pharmaceutical litigation for physicians, must possess a medical degree. This Court holds that he does not. What is necessary is that the witness possess medical knowledge, however obtained.
Generally, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, an expert witness may testify thereto in opinion form or otherwise. Anchor Coatings, Inc. v. Marine Indus. Res. Insul. Inc., 490 So.2d 1210, 1217 (Miss. 1986); Hardy v. Brantley, 471 So.2d 358, 366 (Miss. 1985); Hall v. Hilbun, 466 So.2d 856, 873 (Miss. 1985).
A witness may qualify as an expert based on his knowledge, skill, experience, training, education, or a combination thereof. Qualification as an expert does not necessarily rest upon the educational or professional degree a witness possesses. Sonford, 495 So.2d at 473. Hall v. Hilbun, 466 So.2d at 873. See also, Rule 702, Mississippi Rules of Evidence, effective January 1, 1986. Simply put, before one may testify as an expert, that person must be shown to know a great deal regarding the subject of his testimony. As a pharmacologist/toxicologist, Hughes was an expert in the area in which his testimony was offered. Mississippi Farm Bureau Mut. Ins. Co. v. Garrett, 487 So.2d 1320 (Miss. 1986).
Other jurisdictions have held likewise. In Cornfeldt v. Tongen, 262 N.W.2d 684 (Minn. 1977) a chief nurse anesthetist was *615 not allowed to provide expert testimony relative to the use of anesthesia because he was not licensed to practice medicine. The Minnesota Supreme Court held the nurse was competent to testify notwithstanding the lack of a medical degree if he otherwise had sufficient scientific and practical experience about the matter to which he would have testified. Id. at 697.
Likewise, in Hudgins v. Serrano, 186 N.J. Super. 465, 453 A.2d 218 (1982), the Court held that a license to practice medicine was not a sine qua non for qualification as an expert witness in a medical malpractice case. The Court held:
We believe, as did the trial judge below, that while a license does indeed import the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion, that the prerequisite minimal technical training  and perhaps more  may also be gained otherwise and demonstrated as here.
Id. 453 A.2d at 223. See also, Smith v. St. Therese Hospital, 106 Ill. App.3d 268, 62 Ill.Dec. 141, 435 N.E.2d 939 (1982); Mellies v. National Heritage, Inc., 6 Kan. App.2d 910, 636 P.2d 215 (1981).
The instant record reflects that Michael P. Hughes, who taught medical students and advised and counseled physicians as to drug use and administration, through his skill, knowledge, training, and education, knew the standard of care to which physicians adhered when prescribing Bactrim. Therefore, this Court holds that he was qualified to deliver expert testimony, notwithstanding his lack of a medical degree, on the issue of a physician's standard of care in the use and administration of this drug.
This is not to say that every pharmacologist or toxicologist is qualified to testify as an expert to establish the physicians' standard of care. Only if the witness possesses scientific, technical or specialized knowledge on a particular topic will he qualify as an expert on that topic. This witness qualified as an expert and should have been permitted to testify as to a physician's standard of care in issue here.

V.
The proffer of Hughes' testimony suggested that Hughes, had he been permitted to testify, would have opined a departure from the standard of care in the use and administration of drugs in the following respects:
[That] the Defendant departed from the standard of care as established by recognized pharmacological literature in prescribing Bactrim to the Plaintiff; .. . that the Defendant violated the standard of care because Bactrim was not the drug of choice to treat acute pyelonephritis and in fact that said drug was contraindicated; ... that after prescribing Bactrim though contraindicated, the Defendant should have conducted various urine test to determine whether there were crystals of the sulfur developing in her urine, whether her kidneys were properly functioning and the level of protein and sugar in the urine; . .. that the administration of Bactrim and the failure of the Defendant to properly monitor Plaintiff's condition after the administration of same were approximately contributing causes of the onset of the Stevens-Johnson syndrome... .
Because Ms. Thompson was unable to produce an expert witness with a medical degree to establish the standard of care for physicians prescribing Bactrim, the trial judge directed a verdict in favor of Dr. Carter. This Court has now determined that the trial judge should have admitted the package insert into evidence and should have admitted the expert testimony of Hughes. Had this additional evidence been admitted in the complainant's proof, a prima facie case would have been met sufficient to have withstood a motion for directed verdict.
For failure to admit the package insert, properly identified, and the exclusion of the expert testimony of Hughes, the case must be remanded for a new trial. Hardy v. Brantley, 471 So.2d 358, 373-74 (Miss. 1985); Hall v. Hilbun, 466 So.2d 856, 880 (Miss. 1985).
REVERSED AND REMANDED FOR A NEW TRIAL.
*616 HAWKINS, P.J., and ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
WALKER, C.J.,[4] ROY NOBLE LEE and DAN M. LEE, P.JJ., and GRIFFIN, J., dissent.
DAN M. LEE, Presiding Justice, dissenting:
Today's majority opinion pushes us one step further in holding doctors strictly liable for any unfortunate result which occurs when they render medical care. First, the majority opinion will allow the issue of negligence in a medical malpractice case to reach the jury without the plaintiff making out a prima facie case. Second, a manufacturer's drug insert with its attendant hearsay problems can be admitted as "some" evidence of the standard of care for physicians absent expert medical testimony. Third, under the majority's reasoning, because a patient suffers an unlikely allergic reaction to a drug of choice, the doctor is liable. Such a result I cannot support. I respectfully dissent.

I.
Lynette Inez Thompson suffered a tragic case of Stevens Johnson Syndrome, an allergic reaction which neither Dr. Carter nor Ms. Thompson could have predicted. Whether that tragedy resulted from Dr. Carter's negligent prescribing of Bactrim, a drug of choice for kidney ailments, or from Ms. Thompson's overdosing herself and thereby overloading her system with antibiotics by taking penicillin left over from her previous prescription for other ailments, prescribed by another physician, was the issue at trial. The hallmark of our negligence law, without contradiction, provides that the plaintiff must make out a prima facie case. The outright reversal of, and the watering down of the requirements for a prima facie case, as is being done this day, is a step toward relieving the plaintiff of any burden in order to make out a prima facie case of negligence, a new step toward holding doctors strictly liable for rendering medical care.
Our negligence law absolutely requires that a plaintiff prove the following basic elements: (1) duty of care, which includes the standard of care; (2) breach of that duty; (3) causation, consisting of its subparts, causation in fact and proximate cause, and (4) damages. See Prosser and Keeton on Torts, § 30, (W. Page Keeton, 5th Ed. 1984). The plaintiff must make out a prima facie case of negligence before the case can go to the jury. Failing to meet any one of these prongs mandates dismissal.
In this case the only question was, did Dr. Carter prescribe the wrong drug (Bactrim) for kidney infection. The answer is no. However, today's majority opinion would allow the issue of negligence to go to the jury without making out a prima facie case. Two elements are conspicuously missing from Ms. Thompson's case  evidence of the standard of care and evidence of the breach of that standard of care.
For a long time now, and in many cases, this Court has held that the way to prove standard of care and a deviation from the standard of care in a medical malpractice case is through expert medical testimony that defendant "failed in some particular respect to use ordinary care and skill... ." Dazet v. Bass, 254 So.2d 183, 187 (Miss. 1971). Accord Boyd v. Lynch, 493 So.2d 1315, 1318 (Miss. 1986); Hardy v. Brantley, 471 So.2d 358 (Miss. 1985); Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss. 1985); Hall v. Hilbun, 466 So.2d 856, 874 (Miss. 1985); Kilpatrick v. Mississippi Baptist Medical Center, 461 So.2d 765, 768 (Miss. 1984).
No medical expert testified as to the standard of care for a urologist or whether or not Dr. Carter breached that standard of care when he prescribed Bactrim. Nonetheless, the majority tries to make the issue on this appeal one of causation alone, thereby saying that because Ms. Thompson suffered Stevens Johnson Syndrome after *617 taking Bactrim prescribed by Dr. Carter, Dr. Carter must be held liable. A medical malpractice case does not turn on causation alone, but on the standard of care for a physician. In this case the first question which should have been answered is what is the standard of care for a urologist in diagnosing and treating Ms. Thompson's kidney ailment?
The second prong of a medical malpractice case is whether or not the physician breached the standard of care  here, the second question should have been, did Dr. Carter breach the standard of care for a urologist in diagnosing and treating Ms. Thompson's kidney ailment by giving her Bactrim?
Only after the proof is offered as to the first and second prongs, proof of the standard of care and violation of that standard of care by Dr. Carter, can we reach the third prong  did the breach of the standard of care proximately cause the injury? In this case neither proof of the standard of care nor its violation was offered, precluding the plaintiff from reaching his third prong. Therefore, the trial court correctly found that the plaintiff failed to meet her burden of proof and sustained the motion for directed verdict which had the effect of not allowing the case to go to the jury.
Today's majority opinion reverses all precedent of this Court and concludes, illogically, that showing causation is the same thing as showing standard of care and breach thereof. The majority confuses causation with standard of care by saying that the Bactrim drug insert, which lists Stevens Johnson Syndrome as a possible adverse reaction, is "some" evidence of the standard of care when, in fact, all the drug insert shows, by itself, is that Bactrim can cause Stevens Johnson Syndrome. No one disputes that Bactrim can cause Stevens Johnson Syndrome. But there is a question as to whether or not a urologist of ordinary skill and care in these circumstances would have prescribed Bactrim. Only another urologist can tell us that. It is just plain wrong to label evidence of causation in fact as "some" evidence of the standard of care. To do so confuses two separate theories of tort law  strict liability and negligence. A patient who reacts to a drug properly administered under the standard of care for a physician of ordinary care and skill has not made out a prima facie case of negligence. Such evidence is only enough to hold the doctor strictly liable, something neither this Court nor any other has ever done before. The trial court correctly directed a verdict for Dr. Carter. To reverse his ruling flies in the face of this Court's long-established precedents and requirements in malpractices cases.

II.
The admissibility of the drug insert raises two troublesome issues: (1) whether it should be admitted into evidence at all, and (2) if it can be admitted, whether it must be tied to expert medical testimony to be relevant to the standard of care of physicians. Since the drug insert is hearsay, in order to be admissible it must either fit under a hearsay exception or be offered for some reason other than the truth of its statements. In other words, whether or not the drug insert is admissible is tied to the purpose for which it is offered.[1] The majority *618 opinion points to two other jurisdictions that allow admission into evidence of the drug insert  one as evidence of the standard of care ordinarily established by expert medical testimony and other as prima facie proof of the proper method of use of the medication. I respectfully point out that in Ohligschlager v. Proctor Community Hospital, 55 Ill.2d 411, 303 N.E.2d 392 (1973), the court was applying an exception to its rule that expert testimony is "essential to the proof of the standard of professional care." Id. at 417, 303 N.E.2d at 396. The exception is a case of gross negligence, established in that case when the physician ignored specific warnings by the drug manufacturer that improper administration was hazardous. Id. That same court held later that Ohligschlager only applies where the drug manufacturer gives explicit instructions for the drug's use accompanied by precise warnings of a hazardous result should the physician deviate from the instructions  in other words, gross negligence. Young v. Cerniak, 126 Ill. App.3d 952, 971, 81 Ill.Dec. 923, 935, 467 N.E.2d 1045, 1057 (1984). That court went on to say that "we are aware of no case which holds that a drug manufacturer's recommendations regarding dosage, unaccompanied by any warning of adverse consequences if the recommendation is not followed, is proof of the standard of care." Id. at 972, 81 Ill.Dec. at 936, 467 N.E.2d at 1058. See also Lhotka v. Larson, 307 Minn. 121, 238 N.W.2d 870, 874-75 (1976).
Another court has similarly allowed a drug insert into evidence because it was offered to show notice of specific warnings and explicit instructions for use by analogizing it to a DANGER warning. Koury v. Follo, 272 N.C. 366, 376, 158 S.E.2d 548, 556 (1968). In such a situation it is not offered for the truth of its statements; therefore, it is not hearsay. Most pointedly, it still cannot be admitted absent evidence of the standard of care. See, e.g., Sharpe v. Pugh, 21 N.C. App. 110, 114, 203 S.E.2d 330, 333 (1974).
There were no explicit instructions or warnings accompanying the drug Bactrim in the case sub judice that were anywhere near what the Illinois case contemplates to establish gross negligence. Ms. Thompson does not bring her case on a theory of gross negligence. She claims that Dr. Carter should not have prescribed Bactrim for her particular ailment. Dr. Carter testified that in his medical judgment Ms. Thompson's circumstances called for the use of Bactrim. That medical judgment was not shown to fall below the requisite professional standard of care by expert medical testimony.
The other case the majority opinion cites, from Idaho, allowed a drug insert into evidence as proof of a proper method of use. Julien v. Barker, 75 Idaho 413, 423, 272 P.2d 718, 724 (1954). Today's majority goes further, however, and equates proper method of use with standard of care, allowing, then, the insert as "some" evidence of the physician's standard of care. Proper method of use does not equate with standard of care and this is where the majority's logic breaks down. The point thus becomes this: "Reliance solely on the manufacturer's warnings may or may not have been within the standard of medical practice... ." Hamilton v. Hardy, 37 Colo. App. 375, 380, 549 P.2d 1099, 1104 (1976). Since we do not have clear warnings in this case, the drug insert as evidence of the standard of care is admissible only if it is introduced through testimony of an expert medical witness and adopted by such witness as evidence of the standard of care. But that medical expert still must articulate the proper standard of care and establish that a defendant fell below such standard.[2] The majority opinion contemplates using the drug insert in lieu of evidence of the standard of care, again confusing strict liability with negligence.
*619 Appellant here contends that Dr. Carter adopted the drug insert as reflective of the proper standard of care in the use of Bactrim in his testimony as an adverse witness and, therefore, it should have been admitted. To the contrary, Dr. Carter specifically stated several times that the drug insert was one reference in judging when to use the drug. It seems Dr. Carter thus did testify that the drug insert does reflect the proper method of use, which is all the Julien case contemplates. It cannot be reversible error for the trial court to find the drug insert inadmissible on hearsay grounds since the only purpose for which it could be used  evidence of a proper method of use  came out in Dr. Carter's testimony, anyway.[3] It was certainly not reversible error for the trial court to deny admissibility for use as evidence of the professional standard of care, since we have long required expert medical testimony as evidence of the standard of care and breach of that standard of care.
Allowing the insert into evidence in effect tells the jury that since this drug can cause Stevens Johnson Syndrome, and since Ms. Thompson developed Stevens Johnson Syndrome after taking Bactrim prescribed by Dr. Carter, then Dr. Carter is liable to Ms. Thompson. We have never held a doctor strictly liable for unexpected untoward results in rendering medical services. Furthermore, prescription drugs in general have been excluded from strict liability claims even against drug manufacturers where they have been properly prepared and are accompanied by proper directions and warnings. In State Stove Mfg. Co. v. Hodges, 189 So.2d 113, 118 (Miss. 1966), we adopted the language of the Second Restatement of Torts § 402A. Comment k to this section provides:
k. Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
Thus, drug manufacturers are not held to be strictly liable for unfortunate results where the product has been prepared properly and is accompanied by proper directions or warnings. Since Ms. Thompson took a voluntary non-suit against Roche Laboratories, the manufacturer of Bactrim, there is no strict liability issue in this case. Even if Roche were still a party to the suit, 402A excepts prescription drugs from such a claim.
However, it appears that Ms. Thompson tried to continue her theory of strict liability against Dr. Carter. By not providing expert testimony through a physician as to *620 standard of care, but instead trying to introduce the drug insert, she tries to establish Dr. Carter's liability by showing that because he prescribed Bactrim she developed Stevens Johnson Syndrome. This Court has stated, "The law has never held a physician or surgeon liable for every untoward result which may occur in medical practice, and a physician is not a warrantor against bad results." Dazet v. Bass, 254 So.2d 183, 187 (Miss. 1971). Further, "[A] physician may incur civil liability only when the quality of care he renders (including his judgment calls) falls below minimally acceptable levels." Hall v. Hilbun, 466 So.2d 856, 871 (Miss. 1985). The question in this case, clearly, is whether Dr. Carter's conduct in prescribing Bactrim fell below the standard of care  a negligence issue. To establish Dr. Carter's liability in negligence, Ms. Thompson must put on evidence, through a medical expert, as to the standard of care for prescribing Bactrim and whether or not Dr. Carter breached that standard. Allowing the drug insert into evidence as "some evidence" of the standard of care is in effect allowing the jury to find Dr. Carter strictly liable.

III.
The standard of care for the medical profession has to do with the patient/physician relationship. Put most basically, when the patient presents a set of symptoms to a physician, what duty does the physician owe the patient in diagnosing the ailment and prescribing treatment? The physician must observe the patient and the symptoms, apply the symptoms to known an likely diseases, determine whether to hospitalize the patient or treat him/her as an out-patient; if the patient is not to be hospitalized, the physician must determine the appropriate out-patient treatment and remedy, i.e., medication, injection, etc. Once the physician decides on medication, then he may choose, as Dr. Carter did here, one of various well-known drugs for treatment of pyelonephritis. At this point he may consult a Physician's Desk Reference, drug inserts, or a pharmacologist to determine the best drug to be given to this patient for this ailment.
A pharmacologist cannot examine or diagnose. He can be brought in at the point where drugs are prescribed for the diagnosed ailment. Applying this premise to the facts of this case, if Ms. Thompson had put on proof that the standard of care, after diagnosis, would have prohibited the prescribing of Bactrim, but that Dr. Carter did prescribe Bactrim nevertheless, constituting a deviation from that standard of care, then, and only then, could the testimony of Mr. Hughes been admissible  from the standpoint of his specialty  that the wrong drug was prescribed, and that it caused or proximately caused the damages suffered by the plaintiff. Our decision in Sonford Products Corp. v. Freels, 495 So.2d 468 (Miss. 1986), allows such an expert to testify as to causation. But Sonford did not contemplate a toxicologist testifying as to standard of care. Our caselaw still requires "expert medical testimony" concerning a physician's failure to adhere to the requisite standard of care. Boyd v. Lynch, 493 So.2d 1315, 1318 (Miss. 1986); Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss. 1985). Dr. Carter was required to possess and exercise the reasonable degree of learning, skill and experience ordinarily possessed by physicians, not that possessed by pharmacologists or toxicologists. This case did not reach the pharmacological problem because there was no proof that Dr. Carter prescribed the wrong drug in the first place. In fact, there is proof that he did prescribe the drug of choice for kidney infections, Bactrim. If, indeed, Dr. Carter had prescribed the wrong medication for the kidney infection and, therefore, had misprescribed medication for Ms. Thompson, then  and only then  would we have a malpractice case.

IV.
I would affirm the lower court ruling directing a verdict for Dr. Carter. Ms. Thompson failed to meet her burden of proof in that two elements of a prima facie case in negligence were not proven: standard of care and breach of the standard of care. The trial court correctly recognized *621 that our negligence law requires that these two prongs be proven in order to reach the jury; furthermore, our caselaw has, without exception, required that these two prongs be proven. The trial court also understood that standard of care is not the same thing as causation and strict liability and that proof of causation alone does not fulfill plaintiff's burden of proof in negligence. Today's majority decision overturns all that this trial judge  and every other trial judge in the state  understands our medical malpractice law to be.
WALKER, C.J.[4], ROY NOBLE LEE, P.J., and GRIFFIN, J., join this dissent.
NOTES
[1] Dr. Carter contends Thompson's return appointment was March 3, 1976, but Thompson contends the return appointment was March 5, 1976.
[2] Marden G. Dixon and Frank C. Woodside, Drug Product Liability, Vol. 1: The Physicians Responsibility and Liability. (New York: Matthew Bender & Company, 1987), pp. 7-6, 7-7.
[3] Ibid. pp. 7-12.
[4] WALKER, C.J., VOTED ON THIS CASE PRIOR TO LEAVING THE COURT ON OCTOBER 1, 1987.
[1] The majority's analysis of the drug insert as a compilation of information concerning pharmaceutical drugs is not the most satisfactory. Our decisions in Tucker v. Donald, 60 Miss. 460, 470 (1882), and Yazoo & M.V.R. Co. v. M. Levy & Sons, 141 Miss. 199, 210, 106 So. 525, 527 (1925), contemplate compilations of actuarial tables, logorithms, astronomical calculations, and market reports  standard authority for those who use them. While the drug insert probably fits within such a contemplation as to physicians, I would prefer to see us allow the Physician's Desk Reference (PDR) to serve this purpose rather than a single insert from one drug manufacturer. The PDR, a compilation of all such drugs on the market and which contains similar information to the drug inserts, is a reference that a medical expert would possibly rely on in his testimony as much as he would rely on a drug insert. My concern with allowing in the single drug insert under this hearsay exception is that it is too close to an advertising circular for comfort. To allow the insert could arguably give the impression that we consider advertisement circulars to be compilations of information which could be relied on by the public for information, a result we have expressly rejected in Pevey v. Alexander Pool Co., 244 Miss. 25, 139 So.2d 847, 849 (1962).
[2] A North Carolina court has made the same analogy I make regarding admission of drug manufacturers' inserts, that is, that they are more like learned treatises. Koury v. Follo, 272 N.C. 366, 376, 158 S.E.2d 548, 556 (1968). Under our Rule of Evidence 803(18) they should be admitted only to the extent called to the attention of an expert witness upon cross examination or relied upon by him on direct.
[3] Another sister state, New Mexico, has held similarly when faced with deciding the admissibility of a drug insert. See Crouch v. Most, 78 N.M. 406, 432 P.2d 250 (1967).
[4] Chief Justice Walker voted on this opinion prior to his retirement October 1, 1987.