**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2003-CA-01297-SCT**

*GENERAL MOTORS CORPORATION*

*v.*

*PRISCILLA MYLES, INDIVIDUALLY AND ON
BEHALF OF THE HEIRS AT LAW OF JARROD
MYLES, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/23/2003 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | HUMPHREYS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | FRANK M. HINMAN |
| | KARI KROGSENG |
| | GENE D. BERRY |
| | PAUL V. CASSISA, JR. |
| ATTORNEYS FOR APPELLEE: | ANTWAYN LAVELL PATRICK |
| | ISAAC K. BYRD |
| | KATRINA M. BIBB GIBBS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 01/06/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. On October 3, 1998, Jarrod Myles was operating his 1997 Chevrolet Silverado 2500 truck on U.S. Highway 49 between Belzoni and Indianola in Humphreys County, Mississippi, when he suffered fatal injuries in a single-vehicle accident. Alcoholic beverage containers were found by Randy Blakely (Officer Blakely), the deputy sheriff on the accident scene, in and around the truck. The coroner's report concluded that Jarrod's blood alcohol content

(BAC) was .11% ethyl alcohol. On May 25, 1999, Jarrod's widow, Priscilla Myles Calhoun[1] individually and on behalf of Jarrod's heirs at law,[2] (collectively known as Myles), filed a wrongful death action against General Motors Corporation (GM), Herrin-Gear Chevrolet, Inc., and salesman, Joe Powell.

¶2.    Prior to trial, Myles filed a motion in limine to limit the videotape deposition testimony of defense expert, Shan Hales (Hales). Hales is the toxicologist who analyzed Jarrod's blood to determine its BAC at the time of the accident. He determined that Jarrod's BAC level was .11%, but not less than .10%. Hales also tested for the presence of the prescription drug Cylert, the drug that Jarrod was prescribed as a treatment for his narcolepsy. Jarrod suffered from narcolepsy, a condition that caused him to fall asleep. Hales found no Cylert in Jarrod's system.[3] The trial court denied Myles's motion in limine. However, Myles renewed the motion in limine at trial. The jury watched Hales's videotape deposition. On the following day, the trial court determined that Hales's deposition testimony should have been limited because he did not specifically state that his opinion was given to a reasonable degree of probability. The trial court struck Hales's entire videotape testimony. The trial court further found that since the toxicology report was already admitted into evidence, the jury had the results of the tests.

---

[1] Priscilla remarried in January 2001, so she is referred to as Calhoun in the record.

[2] Jarrod had two children born to his marriage with Priscilla, Porscha and Camron.

[3] The Cylert was prescribed to keep Jarrod vibrant and alert to counter his narcolepsy. At trial, Jarrod's widow, Calhoun, testified that she saw Jarrod take his Cylert the day of the accident. However, Hales's testimony was offered to contradict that assertion.

¶3.    While they agreed that a severe impact to the upper control arm ball joint attached to the right front wheel of Jarrod's truck broke the ball stud, as well as other suspension parts, and caused the truck to roll over, the parties presented various experts as to their theory of the accident and the design of the ball stud and the truck's suspension system.  GM contends that Myles did not present expert testimony to theorize how the accident occurred nor to establish an alternative design to prevent such an accident.  However, testimony by Myles's expert witnesses contradicts that position.

¶4.    Robert Jac Cooper (Cooper) testified on behalf of Myles as an expert in vehicular accident reconstruction.  Cooper examined the accident scene and inspected Jarrod's truck to reconstruct the accident.  Cooper determined that Jarrod was headed west at approximately 35 mph prior to the accident, rotated and began to flip, then came to rest on the passenger side. Cooper testified as follows:

> Q.    Could you describe to the jury what that exhibit depicts?
> A.    Yes, sir. ***To the best I can tell, that's the scenario that I believe happened to the truck as it came down the road going at about 35 miles an hour.  It rotated and then began to flip, and it ended up lying, as I've shown it right there, on the passenger side of the vehicle across the roadway.***
> Q.    Now, what facts did you determine to support your opinion in that regard?
> A.    The damage to the vehicle for instance, and the speed at which I believe it was rolling....
> Q.    ***Now, Mr. Cooper, do you have any opinions as to whether the vehicle could have been traveling in the opposite direction, traveling to the east?***
> A.    ***Yes, sir.***
> Q.    Now, what are those opinions?
> A.    Uh -- it's something that could have, based on where the position of the vehicle is on the roadway and the damage to the vehicle and what I believe the rotation of the vehicle had to be to get to that point on the roadway where it came to rest.

3

Q. *Would it have been possible for that vehicle to be traveling eastward and to have hit a culvert in this particular case?*

A. *And coming to rest where it did, with the damage on the vehicle, no, sir, I don't believe so.*

Q. All right. And why did you reach that conclusion?

A. Well, because the way the vehicle is damaged, most of the damage is on the driver's side, and the pictures will show that. Most of the damage is on the driver's side, and the roof. And there's some damage on the passenger side, but not very much. On the diagram that we just had up on the screen, it would be best if I -- could we put that up again, and I can explain better pointing to that, I guess.

(WITNESS STANDS)

Q. Now, could you give the jury some idea of which direction we're being shown in this particular screen?

A. It would be the original position of the vehicle on the right-hand side of the diagram I believe is in the westbound lane heading to the west. And the opposite lane on the bottom there would be the eastbound lane where the vehicle is not going.

Q. Do you have an opinion as to whether the vehicle, itself, left the roadway?

A. Yes, sir, I don't believe it went any other place than I've got it diagrammed on there.

Q. And what are the reasons that you came to that conclusion?

A. Well, one thing, again, I keep going back to the damage of the vehicle and the speed of which I believe it was going. It's not going fast enough to rotate and "rotate," I mean the first part of that accident there would be to slide around in a circle on the roadway with its tires on the ground. It eventually comes to a point where it's going to start flipping over, which it did. It only flipped, I believe, onto the driver's side first, that's what the damage shows, the heaviest damage, and then onto the roof, as I have got it drawn there with the wheels up, then onto the passenger side where it came to rest. So based on all of that, it looks like the movement of the vehicle is just as I've got it diagrammed there.

Q. *And given your conclusions regarding the direction and the speed of the vehicle, would the front right tire on this vehicle have been damaged or have shredded in the scenario that you described?*

A. *Well, it could be, because the initial damage, obviously, was to the right front part of the vehicle. So that tire would have been the damaged area when it first started the motion like I have drawn there.*

Q. And when you were inspecting the vehicle, did you find the tire to be still on the vehicle?

A. I don't remember, but I think the right front tire was still on the vehicle. Yeah, I think the right front tire was still on it.

4

Q. *Now, Mr. Cooper, you state again that you're qualified to make these decisions based on your experience in accident reconstruction?*

A. *Yes, and my training, of course.*

Q. Have you had situations where you've inspected vehicles that have been involved in rollovers?

A. Oh, yes, many, many times.

Q. And based on your evaluation and investigation of this particular accident, do you have an opinion as to whether this vehicle would have rolled over in this accident more than at least one complete time?

A. Yes, sir, I believe it would not have. I believe it only rolled over, as I've drawn there, the driver's side, then the top, and then it came to rest on the passenger side. So it didn't completely make a 360 revolution back onto the tires at any point.

(emphasis added).

¶5. Louis Hess (Hess) testified on behalf of Myles as an expert in failure analysis and metallurgical engineering. Hess testified as to his area of expertise as follows:

A. My particular area of expertise is failure analysis and metallurgical engineering.

Q. If you could, tell the jury what you mean by "failure analysis and metallurgical engineering."

A. My training in metallurgy involves with looking at different metals and their properties and how you use them and how they're processed, et cetera. For failure analysis, that's been my primary focus. *I look at these parts and try to determine why they failed, what may have been going wrong, is there any corrective action that can be done. What type of mitigating procedures you may want to do.*

(emphasis added).

¶6. Hess had also previously had experience working for Chevrolet in its metallurgy laboratory in its co-op program. Hess determined based on examination of the truck's upper ball joint that the upper control ball stud fractured first. Hess determined that GM's hardening process was not uniform, relatively thick in some areas, thin in other areas and non-existent in other areas. Hess testified that an excessively thick non-uniform ball joint caused a bending

5

overload. In Hess's opinion, the ball joint should have little or no case hardening in the area of the ball joint that broke in Jarrod's truck. Hess stated that if GM had a more uniform and a less thick hardening case around the ball joint, the accident would not have occurred. Hess testified on direct examination as follows:

Q. Mr. Hess,... could you give the jury some idea of what happened when this upper ball stud failed?

A. There was a side bending load induced into that ball stud. It broke off. *The suspension essentially, the truck essentially sort of fell down on the suspension, and trapped the tire rod inside which went, flopped over to the side, the way you see it in that picture. And I believe that resulted in the loss of control.* And when that happened, *the vehicle rolled over.*

Q. And how soon between the fracture and -- how much time elapsed been the fracture and the vehicle rollover?

A. *I would say it would have been fairly instantaneous. Once that failed, one of the suspension parts failed, you have no control over that vehicle. In particular, the upper control arm stud failed, causing that side motion of suspension.*

Q. Now what is it about that scenario that made the tire rod stud fail?

A. Once that happened and folded over, it just bent that back and broke that tire rod stud itself. That just snapped up instantaneously....

Q. Now, you talked some about the way the fracture occurred and the composition and the case hardening and the induction hardening and those kinds of things. Do you have any opinion as to whether this particular fracture was preventable?

A. Yes.

Q. What's that opinion?

A. *I believe it would have been preventable if there was a tighter control over having a brittle case in an area of the suspension that's not subject to a wear mechanism, but could possibly be subject to a bending or an overload mechanism.*

Q. When you say "better control," what do you mean by "better control"?

A. *In the process control of how the part is made and manufactured is, to have your process in control that you harden the area that you desire to have a hardened case. In this case that the ball surface is hardened, but not necessarily the mounting feature or the support feature of the stud.*

6

Q. On this particular ball stud, did you measure the hardness or the depth of this hardened case?

A. Yes, I did.

Q. What did you find to be the measurement of this particular casing?...

A. It was thinner than that in some areas and it was much thicker than that in other areas. So it varied from, it will be 30 mills to a hundred mills.

Q. With this particular ball stud and this particular application in the truck, what would you expected to have been the thickness of this particular area?

A. From a metallurgist viewpoint as to what you would like the optimum design of your part to be, I would expect there to be little or no case hardened features in an area of a part that does not required that, because you're giving up ductility in those locations....

Q. Assuming that the part would have the measurements and the depth that you're talking about, would it still be functional?

A. Yeah, it would still work as a ball stud, yes.

Q. Would it still have the same capability in this particular vehicle?

A. Yes, as long as it wasn't subject to a bending load.

Q. Do you have an opinion, Mr. Hess, as to whether this particular ball stud is defectively designed, or defective, I'm sorry.

A. ***My opinion is it's defective in the implementation of the proper practices for case hardening for where they are....*** But I believe it's defective from a metallurgical design standpoint, in that you want a very hard case where you're expecting the parts to wear, and you do not want that high hardness case which gives you much lower ductility in an area that you don't need that hardness.

(emphasis added).

¶7. Myles called Dr. Samuel Gambrell to testify as an expert failure analyst. He found the hardened area of the ball stud to be extremely thick. Dr. Gambrell testified that the ball stud was extremely brittle and, therefore, not able to absorb shock very well. Dr. Gambrell determined that the hardened material in the ball stud made the part defective. Dr. Gambrell testified that he reviewed Cooper's reconstruction of the accident and concurred as to his findings.

¶8.     GM called Allen Wilinski (Wilinski) as an expert in mechanical engineering, metallurgy and accident reconstruction.   Wilinski had been employed with General Motors for over 30 years, testifying for GM in 47 cases.     **Wilinski did not visit the accident scene nor personally inspect Jarrod's vehicle.   Wilinski only viewed photographs of the accident scene and the truck.**   Wilinski relied on Officer Blakely's police report from the accident for information.

¶9.     Officer Blakely prepared an official police report for this accident.   When he arrived at the scene, he discovered Jarrod not moving or breathing and saw a large gash to the mid-portion of his forehead.[4]   He testified that he examined the truck and the accident scene. Officer Blakely did not measure the tire marks at the accident scene, and he did not take any photographs of any marks.   Officer Blakely discovered alcohol containers at the scene of the accident in and around the truck.   He took a photograph of a beer can amongst the debris. Officer Blakely testified as to his account of the accident scene on direct examination by GM's attorney as follows:

> Q.     Deputy Blakely, if you would, tell us, did you see any physical evidence at the scene of the accident that would indicate to you the path of Mr. Myles's vehicle?...
> A.     When I arrived and checked the scene, once all the commotion was cleared up, the vehicle was removed, at night -- it's hard to tell at night, but you can look and see, sometimes you can tell, and it appeared to me that what I was looking at was the path of travel from the vehicle.  That night was it went off the edge of the right shoulder of the road, and it came back up there.  I went back also the next day.  There's also, I could tell where the path of travel was, because where the vehicle came back, where it rested at, I trailed the marks from the tires.  I mean they were

---

[4]  There was no testimony from Officer Blakely in the record to indicate that Jarrod was alive when he arrived at the scene.  According to the exhibits, Humphreys County coroner  Robert C. Ragland was called to investigate the scene.

8

very dense marks, but you could still tell them in the daylight. And the marks came back up onto the road, and that's where the vehicle landed.

Q. All right. What side of the road are we talking about?

A. It would have been to my right. It would have been the right side of the road, which would have been coming from Isola towards Belzoni, traveling in a southeasterly direction....

Q. Tell the jury whether or not you observed any evidence of the path of the vehicle....

A. The path that I could tell came from the vehicle, the vehicle was headed southeast and went off the right-hand side of the road, which would have been coming from Isola to Belzoni in a south-easterly direction. Came off the right-hand side of the road, came back up the right-hand side of the road, and that's where -- I determined that it was headed towards Belzoni, by what I could see.

Q. Did you see any places on the roadway, itself, any evidence of marks or anything on the highway?...

A. There were actual gouge marks in the highway where the vehicle rested at.

¶10.  However, on cross-examination by Myles's attorney, Officer Blakely testified as follows:

Q. *And you admit to this jury you're not an expert in accident reconstruction?*

A. *No, ma'am, I'm not a reconstructionist.*

Q. And shortly after the accident scene, you prepared a police report?

A. Yes, ma'am....

Q. *Show me on this police report where you indicated you saw marks off the side of the road....*

A. *There's not any marks on here.*

Q. When did you first determine the direction of the Myles's vehicle?

A. I determined it that night....

Q. *Show us on the accident report where you indicate the direction of the Myles' vehicle.*

A. *It's not going to be on there.*

Q. You also indicated in your testimony on direct something about a grassy culvert area?

A. On what now?

Q. You mentioned in direct examination –

A. Right.

Q. -- *when General Motors attorneys questioned you, that there was a grassy culvert area in that area.*

9

> A. *Right.*
> Q. *Show us on your police report where you indicate a grass culvert area.*
> A. *I don't draw culverts on my reports.*

(emphasis added).

¶11. And finally, as previously discussed, Hales was called as an expert in the field of toxicology by GM. Hales examined Jarrod's bodily fluids for the presence of ethyl alcohol and his prescribed narcolepsy drug, Cylert. Hales testified via videotaped deposition. However, the trial court based on Myles's objection, struck Hales's testimony in its entirety.

¶12. The trial court refused to grant defense's proposed jury instruction, D-23, which would have instructed the jury that Jarrod was legally intoxicated on the night of the accident when he was driving his truck and that it was negligence as a matter of law to drive while legally intoxicated. Proposed Jury instruction D-23 stated:

> The Court instructs you that Jarrod Myles was driving his 1997 Chevrolet truck on the night of the accident while legally intoxicated. It is negligence as a matter of law to drive while legally intoxicated.
> The Court instructs you it is for you to determine whether such intoxication was the sole proximate cause or a contributing cause to the accident and injuries to Jarrod Myles.
> According, if you find from a preponderance of the evidence in this case that the intoxication of Jarrod Myles was the sole proximate cause of the accident or that such intoxication combined with other negligence, if any, of Jarrod Myles, then it is your duty to find in favor of the Defendants, General Motors and Herrin-Gear.
> If you find from a preponderance of the evidence in this case that such intoxication was a proximate cause of the crash or combined with other negligence, if any, on the part of Jarrod Myles to be a proximate cause and the injuries of Jarrod Myles, then you must assign fault to Jarrod Myles in such percentage as you find the negligence of Myles, if any, caused or contributed to the accident.

¶13. The trial court did grant defense's jury instruction, D-24, which stated:

The Court instructs the jury that it is negligence for a person to drive under the influence of alcohol.

The Court instructs the jury that it is for you to determine whether Jarrod Myles was under the influence of alcohol in any degree, and if so, whether such intoxication contributed to the crash.

Accordingly, if you find from a preponderance of the evidence in this case that the intoxication of Jarrod Myles, if any, was the sole proximate cause of the accident, or combined with other negligence, if any of Jarrod Myles to be the sole proximate cause of the accident, then it is your duty to find in favor of the Defendants, General Motors and Herrin-Gear.

If you believe that such intoxication, if any, was a proximate cause of the crash or combined with any other negligence, if any, on the part of Jarrod Myles to be a proximate cause of the crash and the injuries of Jarrod Myles, then you must assign fault to Jarrod Myles in such percentage as you find that the negligence of Myles, if any, cause or contributed to the accident.

¶14. We find that the trial court erred in denying defense jury instruction, D-23. In *Buel v. Sims*, 798 So.2d 425, 429-30 (Miss. 2001), this Court upheld the jury instruction given by the trial court which instructed the jury that "Debora K. Buel was negligent as a matter of law in operating her vehicle at a time when she had a blood alcohol level greater than 100 mg/dl." Therefore, we find that GM was entitled to receive jury instruction D-23 that it was negligence as a matter of law to operate a vehicle while legally intoxicated. As provided in jury instruction D-23, the jury would then assess if Jarrod's intoxication was the sole proximate cause or a contributing cause to the accident and his injuries. However, since we find that the trial court committed reversible error in striking Hales's entire testimony, here we reverse and remand this case to the trial court solely on the exclusion of Hale's testimony.

¶15. The jury returned a verdict in favor of Myles for $10 million. GM contends that statements in Myles's closing arguments referring to unrelated corporate misdeeds was improper and prejudiced the jury resulting in the jury's verdict. GM filed a motion for judgment notwithstanding the verdict (JNOV), or in the alternative, for a new trial, or

11

remittitur. Myles filed a response to GM's motion. The trial court denied GM's motion for JNOV, however, it granted GM's motion for remittitur and reduced the verdict to $5,428,730. GM now appeals to this Court raising various issues, however, the central issue that requires this Court to reverse and remand the matter to the trial court is the trial court's erroneous decision to exclude and strike Hales's entire testimony. We find that the judgment of the Circuit Court of Humphreys County should be reversed. Neither the jury's verdict nor the remittitur by the trial court will be addressed.

## ANALYSIS

### Hales's Testimony

¶16. The issue raised on appeal that merits reversal is the trial court's decision to strike the video-taped testimony of the defense's toxicologist, Shan Hales. Not only was the trial court's reasoning to strike the testimony flawed, the denial of the toxicologist's testimony constitutes reversible error as Hales's testimony is central to the entire case.

¶17. On appeal, Myles does not dispute that Jarrod's BAC was .11% nor does she contest how the blood and fluids were drawn. In fact, Myles heavily relies on GM's exhibit GM-4, the Mississippi Crime Laboratory report, which tested Jarrod's BAC level and determined that Jarrod's BAC was .11% to support the exclusion of Hales's videotape testimony. The exhibit

12

contained the toxicology report prepared by Hales.[5] [6]   On appeal, Myles states in her brief that, "[t]he trial court appropriately determined since the report of Mr. Myles stating his blood alcohol level was .11% and the drug Cylert was not in Mr. Myles['s] system [was admitted into evidence], the [testimony of the] Defendant's toxicologist will not [be] of any assistance to the jury."   Myles further states in her brief that "the [trial] court subsequently struck Mr. Hales's testimony in its entirety because Mr. Hales could only testify to what was in his toxicological report, and since the report had already been admitted into evidence, the testimony of Mr. Hales would have been cumulative."

¶18.   At trial, Hales was not challenged for lack of qualifications as an expert.   Hales testified that he was employed at the Mississippi Crime Laboratory as a forensic toxicologist.   Hales stated that he had testified in court approximately 30 times.

¶19.   Instead of challenging Hales's qualifications, Myles argued, and the trial court agreed, that Hales's opinions were not offered in the proper form, "to a reasonable degree of probability."   Hales examined Jarrod's blood and vitreous fluid for the presence of alcohol.[7]

---

[5] The report only states the alcohol content determination. The report contains Hales's findings that Jarrod's BAC was .11% ethyl alcohol. There is no reference to the drug Cylert. It states that "[t]raffic related cases in which blood alcohol concentration is 0.10% or greater are not routinely screened for drugs. However, if drug analysis is necessary in this case, please contact Shan Hales in the Toxicology Department."

[6] Exhibit GM-3, the coroner's report prepared by Ragland as coroner for Humphreys County, Mississippi, also contains Hales's laboratory findings that he prepared as forensic toxicologist at the Mississippi Crime Laboratory. Hales's report only contains an alcohol content determination. It is the same report prepared by Hales that is also contained in exhibit GM-4. The coroner's report further contains Ragland's findings when he arrived at the scene of the accident. Ragland requested alcohol and drug analysis from the Mississippi Crime Laboratory.

[7] Vitreous fluid is fluid drawn from the eye. According to Hales, it is routinely collected in death investigation as it is excellent in testing for alcohol.

13

The blood and vitreous fluid contained .11% ethyl alcohol. The National Medical Service, routinely used by the crime lab, prepared a report finding the presence of ethyl alcohol at a level of 108 milligrams per deciliter or the equivalent of a BAC of 0.10 percent.[8]

¶20. Jarrod's blood was also tested for the presence of any drugs by the National Medical Service which did not detect any drugs other than ethyl alcohol. Hales testified that the drug screen would have detected the presence of the drug Cylert or Pemoline. Therefore, the National Medical Service's test did not detect any narcolepsy medication. However, Hales's testimony was challenged for not stating his opinion as to the effect of the BAC level and the lack of Cylert in Jarrod's system on whether that caused or contributed to the accident. The trial court struck the entire testimony based on the challenge.

¶21. The trial court's reasoning is flawed. While Hales's response did not used the words "within a reasonable degree of probability," the question proposed to Hales was phrased in that form.

¶22. When deposed by GM's attorney as to the effect of the consumption of alcohol in connection with also suffering from the condition of narcolepsy on a person's driving ability, the record reflects:

> Mr. Berry: If you would, do you know what the effects of an alcohol level in the blood of greater than .10 would have on the driving ability of an individual?
> Mr. Hales: Yes, I do.
> Mr. Berry: All right. If you would explain that to us.
> Mr. Hales: *Any individual with a blood alcohol concentration of .10 percent or greater would have impaired judgement. They would also have impaired decision making ability. They would*

---

[8] Hales testified that the Mississippi Crime Laboratory routinely used the National Medical Service.

14

> *have impaired divided attention abilities, which is the ability to do more than one task at one time, which is what is required when driving a motor vehicle.*
> They would also have increased reaction time. In other words, it would take them longer to react to a stimulus.

Mr. Berry: Do you know whether a lack of sleep could have an affect on a person's driving ability if they had consumed alcohol in excess of the legal limit?

Mr. Hales: If an individual had experienced a lack of sleep, they could possible already be impaired in their ability to drive simply due to their loss of sleep. *That, in addition to a blood alcohol concentration of .10 percent or greater, would definitely add to the degree of impairment of an individual.*

Mr. Berry: What about a person who suffers from the condition of narcolepsy? If they had consumed alcohol in excess of the legal limit, what affect would that have on their driving ability?

Mr. Hales: *In my opinion it would probably also be exacerbated by the presence of .10 percent or greater blood alcohol. As with a lack of sleep a tendency to fall asleep or the presence of a condition such as narcolepsy, that would also add to the degree of impairment.*

(emphasis added).

¶23. However, on cross-examination by Myles's attorney, Hales again testified as to his opinion regarding whether an individual with a BAC of .11% would have a possible impairment that would contribute to an accident. In phrasing the question, Myles's attorney asked for Hales's opinion within a reasonable degree of probability. In fact, the record reflects:

Mr. Northington: Do you have an opinion as to whether the blood alcohol content of Jarrod Myles that you found had any relationship to the accident that he was involved in October 3, 1998?

Mr. Hales: It's my opinion that an individual with this blood alcohol concentration would be impaired, and that it would certainly be possible that that impairment would contribute to an accident.

Mr. Northington: *But to a reasonable degree of probability, do you have an opinion as to whether it is related to the accident?*

Mr. Hales: *It's my opinion that if an accident occurred and an individual had a blood alcohol concentration of .11 that, yes, the alcohol would be a contributing factor to the accident.*

(emphasis added).

¶24.   M.R.E. 702 provides for the admission of testimony by experts, stating:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

¶25.   The admission or exclusion of evidence is reviewed for abuse of discretion. ***Whitten v. Cox***, 799 So.2d 1, 13 (Miss. 2000).   "Where error involves the admission or exclusion of evidence, this Court 'will not reverse unless the error adversely affects a substantial right of a party.'" ***Id***. at 13 (citing ***Floyd v. City of Crystal Springs***, 749 So.2d 110, 113 (Miss. 1999)).

¶26.   As previously stated, Hales's testimony was not challenged for lack of qualifications as an expert or his expertise to give his opinion.   This Court has addressed the use of a toxicologist's testimony concerning causation.   ***Thompson v. Carter***, 518 So.2d 609, 613-14 (Miss. 1987).

¶27.   In ***Thompson***, Michael Hughes was offered as an expert witness in the fields of pharmacology and toxicology.   ***Id***. at 613.   The issue raised was whether Hughes's proffered testimony should have been admitted concerning causation or the medical standard of care with respect to use and administration of drugs despite the fact that he did not possess a medical degree.   ***Id***. at 614.   In reaching its decision, the Court relied on ***Sonford Products Corp. v.***

16

*Freels*, 495 So.2d 468 (Miss. 1986), *overruled on other grounds*, **Bickham v. Dep't of Mental Health,** 592 So.2d 96 (Miss. 1991). In **Sonford**, the Court recognized that "medical causation" is no more than "causation in fact." 495 So.2d at 472.

¶28. In applying the **Sonford** rationale, the Court held that, "[a] pharmacology/toxicologist would be at least equally competent to testify concerning what effect a certain drug would have on the human body." **Thompson**, 518 So.2d at 613-14. The Court further found that Hughes was also "qualified to deliver expert testimony, notwithstanding his lack of a medical degree, on the issue of a physician's standard of care in the use and administration of this drug." **Id**. at 615.

¶29. Likewise, in **O'Neal v. Roche Biomedical Laboratories, Inc.**, 805 So.2d 551, 552 (Miss. Ct. App. 2000), Michael Weaver, a toxicologist at the Mississippi State Crime Laboratory, provided testimony that the decedent has a blood alcohol level of 0.26% and the effect that would have on the decedent's abilities. Weaver testified that the decedent's "ability to walk, see and perceive things around him would have been significantly diminished by his intoxication." **Id**. While the court did not address Weaver's testimony as an issue, the court discussed Weaver's testimony in connection with the issue addressed by the court of whether or not the trial court erred in failing to give a jury instruction for a specific form of a verdict in a comparative negligence case. **Id**. at 554.

¶30. In the case sub judice, the trial court's decision to exclude and strike Hales's entire testimony requires reversal and remand. Hales's testimony was crucial to GM's theory of

defense at trial and critical to GM's central disputes as to how the accident occurred and what caused the accident and Jarrod's resulting fatal injuries.

¶31. This Court has held that it constitutes reversible error to restrict an expert's testimony about the main issue in the case. *Mississippi Power & Light Co. v. Lumpkin*, 725 So.2d 721, 733-34 (Miss. 1998). In *Lumpkin*, a case involving a negligence action brought by the mother, Leslie Lumpkin, of the passenger, Kristen Black, against the utility company and the driver of the vehicle, Randy Tackett, that struck the utility pole. *Id*. at 722. The Court was faced with the trial court exclusion of MP&L's expert witness's, Bob Marsh, testimony. *Id*. at 733. MP&L tendered and the trial court accepted Marsh as an expert in the field of engineering. *Id*. Marsh testified that the power line in question, in his opinion, met the National Electrical Safety Code. *Id*. at 726. However, Lumpkin's attorney objected, as follows, to the questioning of March as to his opinion as being a discovery violation:

> Q. Do you have an opinion as to whether or not prior to November 23rd, 1989, it was reasonably–from an engineering standpoint, it was reasonably foreseeable that an out-of-control vehicle would strike this pole?
> MR. LISTON: We object, Your Honor. That's not one of the opinions that this witness said to have in the discovery.

*Id*. at 733.

¶32. The trial court sustained Lumpkin's objection, and MP&L made its proffer to the trial court. This Court found that the trial court committed reversible error, stating:

> Foreseeability was *clearly the main issue in the case* about which Lumpkin was prepared to and did offer expert testimony. There was no time needed for further preparation. Lumpkin does not even claim actual surprise or prejudice if this testimony was admitted. Under these circumstances *it is a clear abuse of discretion to exclude the testimony*. This error requires reversal.

18

*Id*. at 734 (emphasis added).

¶33.    Therefore, we find that here the trial court erred in excluding and striking Hales's entire videotape testimony.    Exclusion of Hales's testimony constitutes reversible error.    Hales's opinion and testimony regarding Jarrod's intoxication and lack of the prescription drug Cylert and the effect on causing or contributing to Jarrod's accident is crucial to the main issue and central to GM's defense.

## CONCLUSION

¶34.    For the foregoing reasons, the judgment of the Humphreys County Circuit Court is reversed, and this case is remanded for a new trial consistent with this opinion.

¶35.    **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING**.