# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 2000-CA-00089-SCT

*DEBORA K. BUEL*

*v.*

*PERCY B. SIMS AND AIR LIQUIDE AMERICA CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/29/1999 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WOODROW W. PRINGLE, III |
| ATTORNEYS FOR APPELLEES: | JAMES O. DUKES |
| | RICHARD JOEL SMITH, JR. |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 03/15/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/5/2001 |

**BEFORE McRAE, P.J., WALLER AND COBB, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. Debora K. Buel sued Percy B. Sims and his employer, Air Liquide America Corporation, for injuries she suffered in an automobile accident where she collided with an Air Liquide truck driven by Sims. Buel claims that Sims was negligent in failing to yield the right of way, keep a proper look out and control his truck.

¶2. Prior to trial, Buel filed a motion in limine seeking to bar evidence of her consumption of alcohol, specifically hospital test results, until Sims and Air Liquide had proven her consumption of alcohol contributed to or caused the accident. Buel also sought through an additional motion in limine to prohibit introduction of her medical records and alleged blood sample results until Sims and Air Liquide established the proper chain of custody and proper witnesses testified to sponsor the evidence offered. Both motions were denied by the trial court.

¶3. At the request of Sims and Air Liquide, jury instruction D-6 was given instructing the jury to find Buel negligent as a matter of law in operating her vehicle at a time when she had a blood alcohol level greater than 100. In granting jury instruction D-6, the trial court took judicial notice of number conversions for determining Buel's blood alcohol level. The jury rendered a verdict in favor of Sims and Air Liquide, judgment was entered accordingly, and Buel appealed. Sims and Air Liquide filed a cross-appeal, assigning as error the trial court's failure to grant them a directed verdict for which we find no merit and do not address. Finding no reversible error, we affirm.

## STATEMENT OF CASE AND FACTS

¶4. One Saturday evening in March of 1997, Buel and friends attended a hockey game on the Mississippi Gulf Coast, at which Buel admitted to consuming several sixteen-ounce cans of beer. After the game ended, Buel proceeded to drive herself home. From the hockey game, Buel traveled north on Menge Avenue. As she crested the I-10 overpass, she saw Sims' 18-wheeler pulling out of a parking lot to turn north onto Menge Avenue.

¶5. Buel took no evasive action, assuming the 18-wheeler would be out of her lane of traffic before she arrived. Buel admitted she could have stopped before reaching the truck had she begun to slow down when she initially saw Sims. As Buel got closer to the truck, she realized that it would not clear her lane in time and that she was not going to be able to stop. Once she realized she could not avoid the collision, Buel applied her brakes, slipped off her shoulder belt and lay across the seat to avoid being decapitated. Buel's car collided with the truck driven by Sims.

¶6. On the evening of the accident, Sims, the truck driver, was returning to his home in Louisiana, after making a delivery. Sims stopped at a truck stop on Menge Avenue to refuel and for a routine coffee break. After his break, Sims conducted a pre-trip safety inspection and ascertained that all of his lights were working. As Sims' trailer had been washed on the morning of the accident, the reflective strips running the length of the trailer would have been clearly visible to approaching motorists.

¶7. Traffic on Menge Avenue was very congested on the evening of the accident, forcing Sims to wait several minutes for traffic to clear before pulling onto Menge Avenue. As Sims began his turn onto Menge Avenue, Buel's vehicle first appeared over the crest of Menge Avenue, approaching at a high rate of speed and not slowing down. Sims accelerated and tried to steer his truck to clear Buel's lane. After the impact, Sims went to assist Buel when he noticed an overturned plastic cup and what appeared to be spilt liquid giving off the strong smell of an alcoholic beverage.

¶8. Two eyewitnesses, Joe and Sunshine Yates, were in their car across the street from the truck stop, waiting for traffic to clear so they could exit onto Menge Avenue. Joe was about to pull out of the parking lot when he looked to his right and realized Sims had already begun to exit. At the point Sims had halfway entered onto Menge Avenue, Joe stated that he first saw Buel's car "come out of nowhere, traveling at a high rate of speed." Immediately after impact, Joe rushed to assist Buel, noticing the strong smell of alcohol and that Buel's speech was slurred. Sunshine, Joe's wife, confirmed that Sims had already entered Menge Avenue when she observed Buel's vehicle top the crest on Menge avenue, traveling "pretty fast." After the collision, Sunshine remained in the car with her sleeping children and was unable to offer any additional testimony.

¶9. Following the accident, Buel was transported by ambulance to Memorial Hospital in Gulfport, where she was treated and discharged. Buel suffered numerous injuries, including a broken ankle, and pain in her ribs, chest and legs. Blood tests performed at the hospital reflected a blood alcohol content for Buel of 183 milligrams per deciliter. Buel's medical expenses totaled $5,418.83, and she incurred property losses of $7,400.

## DISCUSSION

### I. DID THE TRIAL COURT ERR IN FAILING TO GRANT BUEL'S MOTIONS IN LIMINE?

¶10. Through her motions in limine, Buel sought to prohibit the admission of the blood alcohol test results unless and until Sims and Air Liquide had: 1) proven that consumption of alcohol contributed to or caused the accident; and 2) established the proper chain of custody and obtained witness testimony to sponsor the evidence offered. The trial court denied Buel's motion and admitted the blood test results into evidence.

¶11. This Court has consistently ruled that "[t]he relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." *Martindale v. Wilbanks,* 744 So. 2d 252, 253 (Miss. 1999) (citations omitted). Unless the trial judge's discretion is so abused as to be prejudicial to a party, this Court will not reverse his or her ruling. *Id.*

### A. Proof that Buel's alcohol consumption caused or contributed to the accident.

¶12. Buel argues that as no evidence was offered to show she suffered from any impairment which caused or contributed to the accident, the trial court erred in failing to exclude the blood alcohol test results. Buel relies heavily on our decision in *Pope v. McGee,* 403 So. 2d 1269, 1271 (Miss. 1981), where, on retrial, we excluded evidence of two six packs of warm beer and a white powdery substance found in the defendant's vehicle. The patrolman investigating the accident testified that he was unable to detect the smell of alcohol on the defendant's breath, and a blood test showed no alcohol in his blood. *Id.* As there was no indication that the defendant had been drinking or under the influence of drugs, we directed that the evidence not be admitted on retrial.

¶13. Unlike the facts in *Pope,* there was overwhelming evidence that Buel had been drinking beer on the evening of the collision. Buel admitted to consuming "several sixteen ounce beers" prior to her collision, and there was testimony that Buel smelled like alcohol and that her speech was slurred. We have previously held that one's own admission of alcoholic consumption in the hours preceding an accident provides a sufficient evidentiary basis to submit the question to the jury. *Mills v. Nichols,* 467 So. 2d 924, 929 (Miss. 1985). As such, we find that Buel's reliance on *Pope* fails, and that the trial court properly admitted proof of Buel's alcoholic intake.

### B. Chain of custody and sponsoring witness

¶14. Buel argues that before her medical records could be admitted at trial, Sims and Air Liquide had the burden of proving chain of custody and providing a sponsoring witness, though Buel does not dispute the authenticity of the records, and made no objection that this was not a proper self-authentication under M.R.E. 902(11). A review of the record reveals that the blood alcohol test at issue was performed at Memorial Hospital in Gulfport, where Buel was transported for treatment following the accident. The test report was maintained by Memorial Hospital as part of Buel's medical records while at the hospital. At trial, Sims and Air Liquide produced a certified copy of Buel's medical records, together with the affidavit of the custodian of those records. We have traditionally deferred chain of custody questions to the trial court and will not disturb those findings absent an abuse of discretion.

> Typically, we defer to the trial court's determination of whether authorities have maintained the chain of custody. When reviewing the chain of custody, we will not disturb the finding of the trial court unless there has been an abuse of discretion. The test to determine whether there has been a break in the chain of custody is whether there is evidence of probable tampering.

*Jackson v. Daley,* 739 So. 2d 1031, 1035 (Miss. 1999).

¶15. Buel also argues that the trial court should have excluded her medical records because of the failure of Sims and Air Liquide to call a sponsoring witness pursuant to Mississippi Rule of Evidence 901. Buel contends that such sponsoring witnesses should have included the technician who drew the blood, the Puckett Laboratory representative who performed the test, and the testimony of a witness capable of interpreting the results. In arguing that M.R.E. 901 requires authentication and identification as a condition precedent to admissibility, Buel relies heavily on our decision in *Fulton v. City of Starkville,* 645 So. 2d 910 (Miss. 1994).

¶16. In *Fulton*, the defendant challenged the results of a blood alcohol test on the basis that the statute required a "chemical test" by breath only. *Id*. at 911. The Court, in finding the argument without merit, noted that the blood alcohol content test was a proper test contemplated by statute. We further stated that in determining the admissibility of these tests, the inquiry should focus on the "accuracy, reliability and proper admissibility of evidence." *Id.* at 914.

¶17. Unlike *Fulton,* with Buel, we are dealing with a civil, not criminal, matter, and there are no statutorily prescribed procedures. Instead, we have a test administered by hospital personnel for medical purposes. Buel's blood test is no different from the results of an x-ray, a myelogram or a myriad of medical tests which are routinely admitted into evidence as part of a party's medical records. The relevancy and admissibility of evidence are largely within the discretion of the trial court, and reversal may be had only where that discretion has been abused, a situation which does not exist here. *Johnston v. State,* 567 So. 2d 237, 238 (Miss. 1990); *see also* *Hentz v. State,* 542 So. 2d 914, 917 (Miss. 1989); *Monk v. State,* 532 So. 2d 592, 599 (Miss. 1988).[1] We see no abuse of discretion here.

## II. DID THE TRIAL COURT ERR IN GRANTING JURY INSTRUCTION D-6?

¶18. During trial, the court granted jury instruction D-6 which states: "The court instructs the jury that Debora K. Buel was negligent as a matter of law in operating her vehicle at a time when she had a blood alcohol level greater than 100 mg/dl." In drafting instruction D-6, Sims and Air Liquide, relied upon Miss. Code Ann. § 63-11-30(1), which provides the base level of alcoholic concentration for intoxication, by stating in part that:

> It is unlawful for any person to drive or otherwise operate a vehicle within this state who . . . has an alcohol concentration of 10/100 percent (.10%) or more for persons who are above the legal age to purchase alcoholic beverages under state law . . . in the person's blood based upon grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath as shown by a chemical analysis of such person's breath, blood or urine administered as authorized by this chapter. . . .

¶19. Buel's blood alcohol level was expressed in terms of 100 milligrams per deciliter, rather than grams of alcohol per 100 milliliters of blood as set forth in § 63-11-30(1). Buel argues that absent accompanying expert testimony interpreting and converting her blood alcohol level from milligrams per deciliter to grams per milliliter, the medical records fail the test for relevance as set forth in M.R.E. 401 and are, therefore, rendered inadmissible under M.R.E. 402.

¶20. The trial court took judicial notice of the conversion from milligrams per deciliter to grams per milliliter, [2] and allowed the evidence to be admitted. M.R.E. 201(b) states that a judicially noticed fact must be one

not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. We have held the following facts to be capable of judicial notice:

> Where the strictures of the rules have otherwise been met, we have over the years--pre-Rules and post-Rules--recognized that a court may take judicial notice that "a certain town or city is within a certain county," *Jackson v. State*, 556 So. 2d 335, 336-37 (Miss.1990); of the official acts of public officials, *Frazier v. State by and Through Pittman*, 504 So. 2d 675, 681-82, fns. 3, 5, 8, 10 (Miss.1987); of the fact that 11:00 p.m. does not occur "in the daytime" within the limitations of a search warrant, *Strange v. State*, 530 So. 2d 1336, 1339 (Miss.1988); of statistical information concerning unemployment levels and average weekly wages, *Eidt v. City of Natchez*, 421 So. 2d 1225, 1229-30 (Miss.1982); of the geologically establishable behavioral properties of natural gas under pressure, *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board*, 457 So. 2d 1298, 1307 (Miss.1984), reversed on other grounds, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986). Closer to the case at bar, we have implicitly noticed the status of corporate enterprises in *Morco Industries, Inc. v. City of Long Beach*, 530 So. 2d 141, 142-44 (Miss.1988) and *Administrators of the Tulane Educational Fund v. Cooley*, 462 So. 2d 696, 699-700 (Miss.1984), and the incorporated status of municipalities and villages, *City of Aberdeen v. Bank of Amory*, 191 Miss. 318, 322, 2 So. 2d 153, 155 (1941); *King v. Caraway*, 132 Miss. 679, 688, 97 So. 422, 424 (1923); *Owen v. Anderson*, 119 Miss. 66, 71, 80 So. 386, 387 (1919). See also *Caruthers v. Panola County*, 205 Miss. 403, 418, 38 So. 2d 902, 906 (1949) (judicial notice that Panola County is divided into two judicial districts and that Batesville is the county seat of the second district).

*Enroth v. Memorial Hosp. at Gulfport,* 566 So. 2d 202, 204 (Miss. 1990).

¶21. While this Court has not specifically addressed the question of whether a court may take judicial notice of the mathematical conversion from milligrams per deciliter to the equivalent grams per milliliters, we have held that, "[a] court may look to any source it deems helpful and appropriate, including official public documents, records and publications. The Court is not limited by rules of evidence otherwise enforceable in judicial proceedings." *Id.* at 205.

¶22. Finally, other jurisdictions have approved trial judges making conversions from milligrams per deciliter to grams per 100 cubic centimeters, as was done with Buel's blood alcohol content. *See Veasey v. State,* 531 So. 2d 320, 322-23 (Ala. Crim. App. 1988) (The taking of judicial notice of the fact that, since 100 cubic centimeters is equivalent to one deciliter, 246 milligrams per deciliter is equivalent to .246 grams per 100 cubic centimeters, was affirmed on appeal); *People v. Kotecki,* 666 N.E.2d 37, 41-42 (Ill. App. Ct. 1996) (On appellate review, it was concluded that the trial court properly converted a blood alcohol level of 153 milligrams per deciliter into a reading of .153, which was greater than a blood alcohol content of .10 as set forth in the relevant statute).

¶23. We find that the grant of jury instruction D-6 was proper and that the trial court acted within its discretion by taking judicial notice of Buel's blood alcohol content as expressed in § 63-11-30(1).

## CONCLUSION

¶24. For the foregoing reasons, the trial court's judgment is affirmed.

¶25. **ON DIRECT APPEAL: AFFIRMED; ON CROSS-APPEAL: AFFIRMED.**

**PITTMAN, C.J., BANKS AND McRAE, P.JJ., SMITH, MILLS, COBB AND DIAZ, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

1. While not employed in this case, another method of securing records which would satisfy authenticity is set out in Miss. Code Ann. § 41-9-103 (1993) which allows for medical documents under seal to be self-authenticated when subpoenaed, by stating in part that:

> . . . . when a subpoena duces tecum is served upon a custodian of records of any hospital . . ., requiring the production of all or any part of a patients record, . . . it is sufficient compliance if the custodian or other officer files with the court clerk . . . a true and correct copy . . . of all records described in such subpoena.

2. Buel's blood alcohol content based on hospital records was 183 milligrams per deciliter, and after the trial judge's conversion to reflect blood alcohol content as measured under Miss. Code Ann. § 63-11-30(1), was .183%.