# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-01005-SCT

*E. I. DUPONT DE NEMOURS AND COMPANY*

*v.*

*GLEN STRONG AND CONNIE STRONG*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/17/2006 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN G. CORLEW |
| | DEBORAH DEROCHE KUCHLER |
| | ROBERT D. GHOLSON |
| ATTORNEYS FOR APPELLEES: | ALBEN N. HOPKINS |
| | ALLEN M. STEWART |
| | JAMES D. PIEL |
| | STEPHANIE BROOKS LESMES |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 10/18/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1.     Glen Strong (Strong) and his wife, Connie, collectively "the Strongs," were among thirty-seven plaintiffs who filed suit in the Circuit Court of Jones County, Mississippi, Second Judicial District, against E.I. DuPont de Nemours Corporation (DuPont) in December 2002, in the matter of *Govan v. DuPont, et al.*, Cause No. 2002-376-CV12.  The Strongs did

not have an individual complaint.[1] At the same time, a larger group of approximately 2,200 plaintiffs filed a separate complaint against DuPont in the matter of *Lizana v. DuPont, et al.*, Cause No. 2002-377-CV12, alleging similar injuries as in the *Govan* complaint. In fact, the only major difference in the two complaints was that the plaintiffs' names were different.

¶2. Two Mississippi residents also were named as defendants in the complaints, namely Waste Management of Mississippi and G.B. Boots Smith Corporation, a Laurel trucking company used to fix venue in Jones County, Mississippi.[2] DuPont immediately removed the *Govan* and *Lizana* cases to federal court. DuPont alleged the fraudulent joinder of Waste Management and Boots Smith. The federal court remanded the *Govan* and *Lizana* cases to the trial court in February 2004.

¶3. In July 2004, the trial court entered its initial case management order (CMO), which set an initial trial date of March 30, 2005, for the first plaintiff's case. The CMO also established a procedure to narrow a smaller subset of plaintiffs from the *Govan* and *Lizana* cases for discovery requirements and identification of the initial trial plaintiffs. The CMO specified that the plaintiffs and the defendants had to select three preliminary trial plaintiffs each, whose cases would be tried one at a time in six different trials. This was done to allow discovery to proceed. However, the plaintiffs did not have to disclose which plaintiff would be tried first.

---

[1] The Strongs' claims were not severed from the *Govan* case until January 2005.

[2] Ingram Industries also was named as a defendant, but the Ingram defendants were voluntarily dismissed by the Plaintiffs.

¶4. On February 15, 2005, the plaintiffs designated the Strongs as the plaintiffs to be tried on March 30, 2005. On February 24, 2005, the plaintiffs voluntarily dismissed Waste Management as a defendant. DuPont unsuccessfully removed the case to federal court on the grounds of fraudulent joinder. Thereafter, Boots Smith filed for bankruptcy. The plaintiffs sought to sever Boots Smith due to the bankruptcy. DuPont again removed the case to federal court. The federal court found that the federal bankruptcy court had jurisdiction, but remanded the case on April 12, 2005, to the trial court as matter of discretionary abstention. The trial court rescheduled the Strongs' trial for August 17, 2005.

¶5. The jury awarded Strong a $14,000,000 verdict in compensatory damages, and Strong's wife was awarded $1,500,000 in loss-of-consortium damages. Therefore, the jury's verdict for the Strongs totaled $15,500,000. The trial court found sufficient evidence to submit punitive damages to the jury. However, the jury was unable to agree upon punitive damages, and the trial court granted a mistrial as to the punitive damages. The trial court entered a judgment for the jury's $15,500,000 verdict, plus interest accruing from the date of the verdict. DuPont now appeals to this Court.

**FACTS**

¶6. According to the record, Strong suffered from a long list of chronic health conditions unrelated to the multiple myeloma that he alleges was caused by DuPont. Strong had coronary artery disease, mild congestive heart failure, arrhythmia, obstructive lung disease, and was a smoker.

¶7. Strong was diagnosed with multiple myeloma in 1998. He received treatment at M.D. Anderson Medical Center, receiving extensive chemotherapy and a bone marrow transplant. Strong alleges that since the diagnosis in 1998 with multiple myeloma, he has not had a pain-free day, and he has not had intimate relations with his wife. The multiple myeloma reoccurred in 2000, and Strong was advised that he did not have long to live. Strong received treatment at M.D. Anderson, again receiving extensive chemotherapy and a bone marrow transplant. Since receiving the second transplant, Strong also suffered two heart attacks, one in 2003 and the other in 2004, both unrelated to the multiple myeloma.

¶8. Dr. Sergio Giralt, Strong's doctor at M.D. Anderson, testified that Strong responded well to treatment and had a relatively small chance of the multiple myeloma reoccurring. Dr. Giralt could not testify as to what caused Strong's multiple myeloma, stating in his deposition testimony that multiple myeloma has no known cause. Dr. Giralt stated that he would defer to an epidemiologist or toxicologist as to the cause. In his affidavit introduced during the trial, he stated that he had never undertaken any research as to the causation of multiple myeloma. He testified that there was no cure for multiple myeloma. However, Dr. Giralt's examination of Strong, weeks before trial, revealed that he was in complete remission. Further, Strong's doctor testified that Strong had a greater likelihood of dying from one of his other health conditions unrelated to multiple myeloma than from multiple myeloma.

¶9. DuPont has operated a plant in Harrison County, Mississippi, in DeLisle on the St. Louis Bay since 1979. DuPont's Harrison County plant produces titanium dioxide, which

4

is a bright pigment used in paints, plastics, paper, and other products. The Strongs live in Bay St. Louis, Mississippi, approximately five miles from the DuPont plant.

## DISCUSSION

¶10. On appeal, DuPont raises various assignments of error that it contends merit reversal of the judgment as a result of trial court error.

### I. Striking DuPont's experts.

¶11. This appeal follows a laborious and highly contentious discovery process during which the trial court struck nine of DuPont's witnesses, including the majority of its designated experts. The trial court determined that "based upon the record, the history of abuses in this case, and pursuant to Miss. R. Civ. P. 37(b)(2), 37(e), Rule 11 and the court's inherent powers to impose sanctions on those who abuse the Mississippi Rules of Civil Procedure, the Court finds that DuPont has indeed abused the Mississippi Rules of Civil Procedure."

¶12. In its order in cause number 2005-M-01583-SCT dated August 16, 2005, this Court already ruled on DuPont's emergency petition for interlocutory appeal and motion for stay regarding the trial court's ruling to strike its experts, stating:

> Petitioner seeks relief from the trial court's order striking certain report and fact witnesses from participation in the trial scheduled for August 17, 2005. The Court *finds that the trial court granted the motion to strike these witnesses as a sanction for petitioner's prior abuse of the discovery process.* The Court therefore finds that the emergency petition for interlocutory appeal and motion for stay should be denied.

(Emphasis added). Under Mississippi Rule of Civil Procedure 37 and the inherent power of the trial court to protect the integrity of its process, the trial court has the broad authority to impose sanctions for abuse-of-discovery violations. While the striking of DuPont's expert witnesses is an extreme measure, we find that the trial court acted within its discretion to do so. *See **Miss. Farm Bureau Mut. Ins. Co. v. Parker***, 921 So. 2d 260, 265 (Miss. 2005).

¶13.    In ***Parker***, the Court stated:

> Our trial judges are charged with this responsibility and are in a much better position to resolve all pre-trial issues, including discovery, and it is not, and should not, be part of our mandated appellate review, to resolve such issues. . . . Our trial judges are likewise in a much better position to decide which parties and/or lawyers need to be sanctioned for their behavior, and our trial judges should unhesitatingly exercise this inherent power and authority.

Here, we find that the trial court properly exercised its authority to impose sanctions for abuse-of-discovery violations.

## II.    Admitting affidavit testimony.

¶14.    Over DuPont's objections, the trial court admitted the affidavits of Strong's treating physicians, Dr. Sergio Giralt and Dr. Donna Weber, several days after the trial already had began. DuPont contends that the introduction of the affidavits from Drs. Giralt and Weber was improper and highly prejudicial to its defense of lack of causation. DuPont asserts these affidavits altered Drs. Giralt's and Weber's prior deposition testimony, which was admitted into evidence. These affidavits also were allowed into evidence and available for review by the jury during its deliberations.

6

¶15.    In their depositions, Drs. Giralt and Weber testified that there are no known causes of multiple myeloma.  Drs. Giralt and Weber specialized in the treatment of multiple myeloma, devoting half of their practice to its treatment.  In the affidavits, Drs. Giralt and Weber altered their testimony to state that they were not experts in the causation of Strong's multiple myeloma, had no opinion as to the cause of multiple myeloma, and specialized only in the treatment of multiple myeloma.

¶16.    The Strongs argued that the catch-all provision, Mississippi Rule of Evidence 804(b)(5), allows the admission of the affidavits into evidence.  First, Mississippi Rule of Evidence 804(b)(5) requires that the declarant be determined to be unavailable as discussed above.  Second, Mississippi Rule of Evidence 804(b)(5) further specifically requires:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. ***However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.***

¶17.    The affidavits from Drs. Giralt and Weber, which altered their deposition testimony, clearly were not furnished to DuPont sufficiently in advance of the trial to provide DuPont with a fair opportunity to prepare to meet the affidavits.  Nor did they afford DuPont notice of their intention to offer the statement and the particulars of the affidavits.  *See* M.R.E.

7

804(b)(5). We agree with DuPont's assertion that the introduction of the affidavits from Drs. Giralt and Weber was improper and highly prejudicial to its defense of lack of causation. The affidavits were used by the Strongs to alter the deposition testimony the doctors provided. The assertion that the affidavits were not introduced for that purpose is simply incorrect.

¶18.     These affidavits were never furnished to DuPont as required in Mississippi Rule of Evidence 804(b)(5). The rules of evidence are clear that the use of affidavits in this context is impermissible. The Strongs attempted, several days into trial, to use affidavits to tailor the doctors' deposition testimony, thereby adversely affecting a substantial right of DuPont to have sufficient advance notice of the information contained in the affidavits before trial. *See Fitch v. Valentine*, 959 So. 2d 1012 (Miss. 2007). Accordingly, we find that the trial court erred in admitting the affidavits from Drs. Giralt and Weber.

### III.     Plaintiffs' experts and witnesses.

### A.     James Tarr.

¶19.     James N. Tarr, Plaintiffs' air modeling expert, was allowed to testify despite numerous contemporaneous objections by DuPont. Tarr testified that in general, corporations act to intimidate and deceive regulatory agencies. DuPont objected that the testimony did not apply specifically to DuPont, and was improper and should be struck. DuPont also sought a mistrial based on the series of contemporaneous objections. Tarr stated:

> [T]he people who are what I call in the trenches of the regulatory agencies tend
> to be young, inexperienced, and sometimes they can be intimidated by the

8

> power that they perceive that a major corporation *like DuPont* might bring to bear *if they didn't give DuPont what they want.*

(Emphasis added).

¶20.    Tarr's testimony was not based on DuPont's dealings with any regulatory agency. As DuPont stated in its motion for a mistrial, Tarr speculated about the interaction between a hypothetical company and a hypothetical agency. Tarr's testimony was not specific as to Mississippi, as to DuPont's plant in Mississippi, or as to DuPont.

¶21.    The comments to Mississippi Rule of Evidence 702, which applies to testimony by experts, state, "[t]he use of the hypothetical question has been justly criticized." Here, Tarr's testimony was as to hypothetical regulatory violations by DuPont or DuPont's employees. It was improper to allow testimony lumping DuPont, based on its size, into a hypothetical with other large companies that may have a history of intimidating and deceiving regulatory agencies. From Tarr's line of testimony, the jury easily could have been misled into believing that DuPont was guilty of covering up alleged regulatory violations. Under a Rule 403 balancing test, Tarr's testimony was more prejudicial to DuPont than probative. *See* M.R.E. 403. There exists a real danger that the testimony would unfairly prejudice DuPont and mislead the jury with the accusations of *hypothetical* regulatory violations by DuPont.

¶22.    On remand, the Strongs shall refrain from questioning Tarr as to his speculation about the interaction between a hypothetical company and a hypothetical governmental agency. This line of questioning shall be limited to Tarr's knowledge, if any, of intimidating actions by DuPont or DuPont's employees against a specific regulatory agency.

9

### B.     Victor Hawkins.

### 1.     Hawkins's Alleged Prior Injury.

¶23.    Victor Hawkins, a former maintenance employee of DuPont's DeLisle plant, testified that he had worked for DuPont for eighteen years, until November 25, 1997. Hawkins retired on long-term medical disability. Hawkins testified concerning his personal injury suffered in a maintenance-related accident. DuPont objected to Hawkins's testimony regarding his injuries at DuPont's DeLisle plant. Over DuPont's objections as to relevance, Hawkins was allowed to testify that at some undisclosed date, he was injured when a tank fell and caused the side of the tank to explode.

¶24.    Hawkins testified that he was burned on his arm and from his neck to his belt area by the hydrochloric acid that sprayed out of the tank. Hawkins said he was transported to the hospital and treated, being wrapped for burns. DuPont again logged its continuing objection to relevancy. Hawkins tried to testify as to what some undisclosed member of the plant's safety personnel told him at the hospital. DuPont objected to the testimony as hearsay. Hawkins was allowed to testify that he was required to return to work, despite DuPont's objection as to relevance. Hawkins testified that he returned to the plant to prevent his absence from being counted as a lost workday.

¶25.    DuPont argues that Hawkins, a disgruntled former employee, had no legitimate purpose in testifying about his alleged injury at DuPont's DeLisle plant. DuPont contends that Hawkins's alleged injury was unrelated to claims asserted by the Strongs at trial, and that this testimony unfairly prejudiced the jury against it. "This Court has consistently ruled that

10

'the relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused.'" ***Buel v. Sims***, 798 So. 2d 425, 427 (Miss. 2001) (quoting ***Martindale v. Wilbanks***, 744 So. 2d 252, 253 (Miss. 1999)). "Unless the trial judge's discretion is so abused as to be prejudicial to a party, this Court will not reverse his or her ruling." ***Buel***, 798 So. 2d at 427.

¶26.  Allowing this irrelevant line of testimony over DuPont's repeated contemporaneous objections was error. *See* M.R.E. 402 ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Mississippi, or by these rules. ***Evidence which is not relevant is not admissible***."). (Emphasis added).

¶27.  Therefore as such, we find that the trial court abused its discretion and erred in allowing this line of testimony concerning Hawkins's personal, on-the-job injury while he was an employee at the DuPont DeLisle plant.

### 2.    Hawkins's Personal Observations of Alleged Safety Violations.

¶28.  Hawkins further testified that he was aware during his time at DuPont that in its early days Dupont had released TICL and chlorine fumes into the air.[3]  He testified that DuPont undermined plant safety and was deceitful both to DuPont's headquarters and to the Mississippi Department of Environmental Quality (MDEQ) about safety matters by preparing for their inspections.  While DuPont on appeal finds this testimony to be

---

[3] TICL is also known as titanium tetrachloride, which contains chlorine, ethinor, HCl, and titanium).

11

objectionable, DuPont objected only to the relevancy of Hawkins's knowledge of prior warning of a regulatory agency's inspection and visit from the DuPont home office. Thereafter, DuPont objected only to Hawkins's testifying about hearsay concerning what other people told him. Hawkins corrected these answers and testified to his account of events.

¶29. All of Hawkins's testimony pertained to his personal knowledge. He testified about the cleaning procedures implemented prior to a visit from the DuPont home office. In addition, he testified to the procedures that he was assigned to perform prior to a regulatory visit from MDEQ. Hawkins corrected the objectionable hearsay testimony by testifying only concerning his personal knowledge and observations related to DuPont's safety procedures at the DeLisle plant. DuPont never objected to or cross-examined Hawkins as to a timeline for the alleged safety violations with regard to visits from DuPont's headquarters and/or MDEQ. Accordingly, this assignment of error is without merit.

### IV. Jury instruction D-10.

¶30. DuPont requested the following jury instruction, D-10, which stated in pertinent part:

> The court instructs the jury that in a toxic tort case such as this, the plaintiffs must prove by a preponderance of the credible evidence that the plaintiff was (1) exposed to a dioxin, dioxin-like compound and/or heavy metal emitted by DuPont and (2) was exposed to such emission with sufficient frequency and regularity, and (3) was exposed in sufficient proximity to such emissions so that (4) it is more probable than not that exposure to DuPont's emissions caused Glen Strong's multiple myeloma.

¶31. DuPont argues that this Court in *Gorman-Rupp Co. v. Hall*, 908 So. 2d 749, 757 (Miss. 2005), adopted the "frequency, regularity, proximity" standard in toxic tort cases.

12

DuPont is correct that this Court adopted this standard; however, the Court stated that it was adopted only for asbestos litigation.

¶32.  In *Gorman-Rupp Co.*, 908 So. 2d at 754-57, this Court adopted the "frequency, regularity, proximity" standard as the correct test to be applied in asbestos litigation.  The Court held:

> Gorman asks this Court to adopt the "frequency, regularity, proximity" standard in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986), in the context of summary judgment for asbestos cases.  In *Lohrmann*, the United States Court of Appeals for the Fourth Circuit affirmed the directed verdict entered by the United States District Court of Maryland at the close of the appellant's case in favor of Raymark, Pittsburgh Corning, and Celotex.  *Id.* at 1161.  The court found there was "as a matter of law insufficient evidence to show the necessary element of causation between the use of their products and Lohrmann's claim of asbestos."  *Id.* at 1162.  The court reasoned:
>
>> As asbestos litigation has developed over the past decade, most plaintiffs sue every known manufacturer of asbestos products, and during the course of discovery some of the defendants are dismissed on motions for summary judgment because there has been no evidence of any contact with any of such defendants' asbestos-containing products. Other defendants may be required to go to trial but succeed at the directed verdict stage. Some defendants settle prior to trial, and these are usually the defendants whose products have been most frequently identified by the plaintiff and his witnesses as having been used by the plaintiff or by others in his presence or working near him.
>
> *Lohrmann*, 782 F. 2d at 1162.
>
> In *Lohrmann*, the district court found that "the plaintiff had not proved a reasonable probability of causation between the plaintiff's disease and the products manufactured by Raymark, Celotex, and Pittsburgh Corning."  The court concluded that the district court was correct in its ruling and the "use of the 'frequency, regularity and proximity test' was appropriate in determining whether the inferences raised by the testimony were within the range of reasonable probability so as to connect a defendant's product to the plaintiff's

13

disease process." *Id.* at 1164. The court stated that the "frequency, regularity and proximity test" used by the district court in the context of asbestos cases was an application of the principle stated in ***Lovelace v. Sherwin-Williams Co.***, 681 F. 2d 230 (4th Cir. 1982). In ***Lovelace***, the court discussed the quantum of circumstantial evidence necessary to support a finding of a causal connection and that the permissible inferences must be within the range of reasonable probability. *Id.* at 241. *See **Lohrmann***, 782 F. 2d at 1163.

. . .

***We find that the "frequency, regularity, and proximity" test discussed herein is the correct test to be applied in asbestos litigation*** and is hereby adopted by this Court. Based on the record, Hall falls short of meeting this test. Hall failed to submit any evidence that demonstrated that he had any exposure to an asbestos-containing product attributable to Gorman.

***Gorman-Rupp Co.***, 908 So. 2d at 754-57 (emphasis added).

¶33. The Strongs argue that the "frequency, regularity, and proximity" standard is inapplicable in the context of environmental contamination litigation. The Strongs contend that the term "proximity" would easily confuse a jury into believing that the Strongs needed to be closer to the plant despite expert evidence of exposure. While we find that the trial court properly denied DuPont's jury instruction D-10, we address this assignment of error to clarify that in ***Gorman-Rupp Co.***, this Court did not extend this standard beyond asbestos litigation. Therefore, we find that the trial court did not abuse its discretion in denying the proposed jury instruction, D-10.

## CONCLUSION

¶34. Based on the cumulative error in the record before us, we reverse the judgment of the Circuit Court of Jones County, Mississippi, Second Judicial District, and remand this case to the circuit court for a new trial consistent with this opinion.

14

¶35. **REVERSED AND REMANDED**.

**SMITH, C.J., WALLER, P.J., AND CARLSON, J., CONCUR. LAMAR, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. RANDOLPH, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION. DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J.; JOINED IN PART BY RANDOLPH AND LAMAR, JJ. DICKINSON, J., NOT PARTICIPATING.**

**RANDOLPH, JUSTICE, CONCURRING IN PART AND IN THE RESULT:**

¶36. I concur with the Majority Opinion as to parts I., II., III.(B.), and IV., and the result.

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

¶37. One would never know from reading the majority the basis of Strong's claims against DuPont: that for years DuPont knowingly deposited tons of toxic material into the waters of Bay St. Louis; that according to the United States Environmental Protection Agency (EPA), the DeLisle plant is the second largest emitter of potentially-carcinogenic dioxins in the country; that DuPont was aware of the risks associated with human exposure to these toxins since at least 1983; and that Glen Strong incurred roughly $675,000 in medical bills for treating his cancer which developed after living his entire life in close proximity to the plant and eating contaminated seafood from the bay. In light of these facts, and the thousands of pages of documentation supporting his claims, the "errors" found by the majority can hardly be deemed reversible.

¶38. First, the majority finds that submission of the one-and-a-half page affidavits from Strong's treating physicians "altered their deposition testimony" and was "highly prejudicial"

15

to DuPont. I fail to see how these affidavits altered the deposition testimony *in any way*, and if anything, the affidavits were *helpful* to Dupont's defense. The doctors testified in their depositions that they had no opinion "as to whether or not dioxin exposure can cause multiple myeloma" and that they would defer to other scientists "who have made it their research interest to look into this in ways which are scientifically valid with respect to causation issues." Likewise, the affidavits stated that the physicians "[did] not know the cause of Mr. Strong's multiple myeloma, and [they] have never attempted to determine the cause or form any opinion as to the cause of his disease. [Their] sole purpose is to treat Mr. Strong's multiple myeloma, not to reach opinions about its cause." The affidavits were no different from the deposition testimony already before the jury, and the doctors' statements that they did not know the cause of Strong's cancer could only help DuPont's defense.[4] By no stretch of the imagination can these affidavits be considered "highly prejudicial to [DuPont's] defense of lack of causation." Accordingly, the trial judge acted within his discretion in submitting the affidavit, and it cannot be said that this constituted reversible error, cumulative or otherwise.

¶39.    Second, Victor Hawkins's brief testimony regarding his workplace injury was factually relevant to his personal knowledge of DuPont's safety violations. As a long-term employee of DuPont, Hawkins had witnessed numerous system "blow outs" and other

---

[4]Indeed, in opening arguments, DuPont's attorney argued that the doctors' testimony would support their theory of the case: "If anybody would know whether Mr. Strong's multiple myeloma was caused by dioxin exposure, these doctors from M.D. Anderson would know. And they will not say that multiple myeloma was caused by dioxins."

16

malfunctions that resulted in the release of toxic gases and poisonous fumes. That he was injured on one of these occasions was probative of the fact that he personally witnessed these malfunctions, and this outweighed any prejudicial effect the testimony might have had. To say that Hawkins "had no legitimate purpose in testifying as to his alleged injury," completely disregards the context of this testimony.[5] Furthermore, even if the trial judge abused his discretion in allowing this testimony, only two pages of Hawkins's forty-six page testimony relate to his injury. Therefore, the prejudicial effect of this testimony was minimal at best.

¶40. Finally, the plurality's assertion that James Tarr "testified that in general, corporations act to intimidate and deceive regulatory agencies," is a complete mischaracterization. One of DuPont's main defenses was that their "operations are legal and highly regulated," and that "everything has been done in accordance with the regulations." Tarr was asked how DuPont could get away with the egregious underreporting that his research uncovered. In response, Tarr testified that regulatory agency workers are often "overworked," "underpaid," "inexperienced," and "can be intimidated by the power they perceive," which "makes it very difficult for aggressive enforcement action to be undertaken successfully."

¶41. Yet, the plurality finds that from this one sentence in James Tarr's testimony "the jury could easily have been misled into believing that DuPont was guilty of covering up alleged regulatory violations." However, the jury could not have been misled because they had

---

[5]Oddly, the majority characterizes Hawkins as a "disgruntled former employee," but in the very next section finds that his testimony on safety violations perfectly admissible.

already been presented with a great deal of evidence that DuPont had been underreporting its emissions for years. In just one example, Tarr used the same model approved by the EPA to determine that the amount of dioxins being emitted from the DuPont plant in 1992 was 89.1 grams. Linda Bernard, a DuPont environmental consultant, reported to the regulatory agency that the amount of toxins for that year was only 0.5 grams. According to Tarr, these actions reflected "a very egregious irresponsible history of reporting to regulatory agencies, state and federal." From all the evidence, the jury could easily have inferred repeated regulatory violations by DuPont. Tarr's testimony was based on his expertise and his own scientific testing, not "accusations of *hypothetical* regulatory violations by DuPont." (emphasis in majority). When considered alongside the voluminous evidence indicating regulatory violations, any error in admitting portions of Tarr's testimony could not have been so prejudicial as to "adversely affect[] a substantial right" of DuPont. *Haggerty v. Foster*, 838 So. 2d 948, 960 (Miss. 2002) (quoting *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 113 (Miss. 1999)).

**Conclusion**

¶42.    Today's case is yet another example of this Court's willingness to overturn a jury verdict when individuals have been awarded large damages against corporate defendants. In the last two years, this Court has been asked to consider at least eight cases involving large damage awards in favor of individual plaintiffs, and seven of these cases have been reversed. *Mariner Health Care, Inc. v. Estate of Edwards*, 2007 Miss. LEXIS 520 (Miss. Sept. 13, 2007) (reversing $6.5 million jury award against nursing home); *Horace Mann Life Ins. Co.*

18

*v. Nunaley*, 960 So. 2d 455 (Miss. 2007) (reversing $1.9 million jury award and rendering judgment in favor of life insurance company); ***Baker, Donelson, Bearman & Caldwell, P.C. v. Muirhead***, 920 So. 2d 440 (Miss. 2006) (reversing $1.6 million jury award for legal malpractice and rendering judgment in favor of defendant law firm); ***Hartford Underwriters Ins. Co. v. Williams***, 936 So. 2d 888 (Miss. 2006) (reversing $1.5 million jury award against insurance company); ***Irby v. Travis***, 935 So. 2d 884 (Miss. 2006) (reversing $3.75 million jury award in wrongful death case); ***GMC v. Myles***, 905 So. 2d 535 (Miss. 2005) (reversing $5.4 million award in wrongful death case); ***3M Co. v. Johnson***, 895 So. 2d 151 (Miss. 2005) (reversing $25 million jury award and rendering judgment in favor of manufacturer). *Compare* ***Canadian Nat'l/Ill. Cent. R.R. v. Hall***, 953 So. 2d 1084 (Miss. 2007) (affirming $1.5 million jury award against employer). *See also* Jimmie E. Gates, *Justices Void $36.4M Award in Insurance Suit*, Clarion Ledger, Oct. 2, 2007, at A1. Yet, despite the substantial evidence in this case supporting a jury verdict in favor of the plaintiffs, the majority finds enough "cumulative error" to warrant a reversal. At some point, we must defer to the finders of fact and stop substituting this Court's judgment for that of the jury.

¶43. For the foregoing reasons, I would affirm the judgment of the trial court.

**GRAVES, J., JOINS THIS OPINION. RANDOLPH AND LAMAR, JJ., JOIN THIS OPINION IN PART.**